MUSCATINE LIGHTING COMPANY, Appellant, v. CITY OF MUSCATINE et al., Appellees.

JANUARY 17, 1928.

MORLING, J.—Our view on the question of power of the municipality to issue bonds to provide for the cost of extension and enlargement of an existing municipally constructed and owned electric light and power plant disposes of the case, and, therefore, other questions argued will not be discussed.

As will be seen, the defendant city has a newly constructed plant. At the beginning of this litigation, the defendants sought to maintain the proposition that the additional equipment intended to be installed constituted an independent plant, for the installation of which the city might proceed as for original establishment of a municipal electric light and power plant. This theory is not now seriously urged, if urged at all, and will receive only incidental attention.

The city of Muscatine is incorporated under special charter.

The plaintiff, of course, sues as a taxpayer, though it is engaged in manufacturing and supplying electric current to the inhabitants of the city. On February 10, 1922, two public measures were submitted to the electors of the city, as follows:

"Shall the city of Muscatine, Iowa, establish and erect a municipal electric light and power plant?"

"For the issuance of bonds in the sum of $350,000. for establishing and erecting a municipal electric light and power plant."

Both propositions carried. The bonds were sold, and a plant was erected with the proceeds. Operation of plant began about June 30, 1924. The testimony, however, is that October 1, 1925, was the date set for, and was considered as the date of, final completion of plant. A board of trustees was duly installed as managers, as provided by Section 6810 *et seq.,* Code of 1924. The board received more applications for current than it could grant with safety to the plant. The board wanted an additional boiler, generator, and switchboard (the record is silent as to engine capacity), and, on October 15, 1925, decided "to go before city council at once and ask for special election for bond issue in sum sufficient to install equipment needed." The same date, the city council authorized the city attorney to secure assistance in preparing necessary papers "for a special election to issue $100,000 of bonds for extension of the electric light plant." On October 22, 1925, a bond company agreed to furnish blank bonds, forms of proceedings, and legal service in connection with the proposed issue. This company consulted attorneys in Chicago, who reported that they were unable to find statutory authority for such bonds. Another bond firm was then consulted. The attorney for the latter company testifies that the same Chicago attorneys, in a personal conference with him, advised that the bonds could be issued. A municipal election was held December 28, 1925, at which were submitted and carried, two public measures:

"Shall the city of Muscatine, Iowa, establish and erect an electric light plant?"

"Shall the city of Muscatine, Iowa, issue bonds to the amount of not to exceed $100,000 for the purpose of paying the cost of erecting an electric light plant?"

Thereupon, bonds to the amount of $100,000, being those

now in controversy, were signed, sold to the second bond firm mentioned, and, together with check for the price, were deposited in bank, subject to the outcome of this case.

The testimony on the subject of the real purpose of the issue is extensive. That of one of the electric light plant trustees particularly is quite sophistical and evasive. The constructed plant has unused space adapted to the additional installation desired. The city also has other properties where it might be placed. It is manifest that the original design and purpose were to install additional equipment needed in the plant constructed; that it ought to be there, and there is no serious thought of locating it elsewhere. The trial court filed an opinion, in which he very pertinently says:

"It is clear in the mind of the court that there is no purpose on the part of the trustees of the light plant or the city council to establish a new and separate light plant with the proceeds of these bonds. The purpose is to increase the capacity of the present plant. Any argument that, through use for that purpose, the additions will constitute a separate plant, is specious, and almost a reflection upon the acumen of the court."

The trial court was further of the opinion, in substance, that "the proposed addition" was "part of the process of establishing the plant;" that "the city by its previous acts" had "not exhausted power to establish it;" and that the bonds were lawful, under the original vote for establishment of February 10, 1922.

Defendants' contention, very briefly stated, is that the ultimate result aimed at by the process of original establishment was adequate service; that power to establish is a continuing power, not exhausted by the completion of the plant according to original plans; that the plant, as so completed, if found inadequate, has not been fully established, and bonds for needed extensions are authorized under the original vote. It is argued that the word "establish," as used in the statutes, means "to put on a secure foundation, or in a settled and efficient state," and that, until the plant furnishes service adequate to the existing or growing demands of the community, it is not "established."

A perusal of the statute should at this point be made, to ascertain just what words are used, and to observe the differing

phraseology used in connection with different provisions. Section 720, 1913 Supplement, provides:

"They [cities and towns] shall have power to purchase, establish, erect, maintain and operate, within or without the corporate limits of any city or town, heating plants, waterworks, gasworks or electric light or electric power plants, with all the necessary reservoirs, * * * wires, burners, machinery, apparatus and other requisites of said works or plants. * * * No such works or plants shall be authorized, established, erected, purchased, leased or sold, or franchise extended or renewed or amended, or contract of purchase entered into, unless a majority of the legal electors voting thereon vote in favor of the same at a general, city or special election."

Section 722, Code Supplement, 1913, provides:

"They shall have power to condemn and appropriate so much private property as shall be necessary for the construction and operation of said works or plants, and for the purpose of constructing and maintaining dams * * * as provided for the condemnation of land for city purposes; to issue bonds for the payment of the cost of establishing the same, including the cost of land condemned on which to locate them, * * * That when any city or town shall have voted at an election as is provided in Sections 720 and 721 of the Supplement to the Code, 1907, to purchase, establish, erect, maintain, and operate heating plants, waterworks, gasworks, or electric light or electric power plants, * * * and in such city or town there shall then exist any such heating plant, waterworks, gasworks, electric light or electric power plants, or incomplete parts thereof or more than one, not publicly owned, * * * such city or town may, by resolution, proceed to acquire by condemnation, as hereinafter provided, any one or more of such heating plants, waterworks, gasworks, electric light or electric power plants or incomplete parts thereof and when so acquired may apply the proceeds of the bonds voted or issued in payment therefor and in making extensions and improvements to such works or plants so acquired * * *"

By Section 749, Code of 1897, it is provided:

"The said board of waterworks trustees shall from time to time fix the water rentals or rates to be charged for the furnishing of water, and such rates shall be sufficient, together with the proceeds of the five-mill water levy and the sinking fund levy of

two mills, for the maintenance and operation of such works, the proper and necessary extension thereof, for all repairs, and for the payment of the purchase money or cost, principal and interest, incurred in the purchase or erection of such works, as the same falls due, according to the tenor of the mortgage and bonds given to secure the payment of such purchase price or cost. * * *''

We may say in the first place that there is good reason for differentiating, as these sections do, establishment and construction of heating, water, gas, and electric plants from maintenance and from operation and from extensions and improvements thereof. The establishment and construction of such a plant are not the exercise of those municipal functions which are, in their very nature, governmental, but in the exercise of those which are corporate and proprietary. *First Nat. Bank v. City of Emmetsburg,* 157 Iowa 555; *Incorporated Town of Sibley v. Ocheyedan Elec. Co.,* 194 Iowa 950. See list of cases cited in *Mocha v. City of Cedar Rapids,* 204 Iowa 51. The municipality incurs, or may incur, corporate liabilities which may greatly burden the taxpayer. It may therein bind itself by commercial contracts. It in practical operation furnishes heat, water, gas, and electric current for commercial enterprises. If these are furnished at a loss, or if the utility is not profitable, the loss falls on the taxpayer, who thereby is taxed, not merely for his proportion of the cost of government, but for the city's loss, and (perhaps) consumers' gain in commerce and industry. As a general proposition, a municipality ought not to operate utilities at the expense of taxpayers, any more than a private corporation ought to operate them at a loss to its stockholders. They should be made to pay their own way, and the taxpayers ought not to be called upon to assume a burden that was never intended by the establishment.

The power to issue bonds is by Section 722 limited to the purpose of making "payment of the cost of establishing the same, including the cost of land condemned, * * *'' except where an existing plant or incomplete parts of a plant, are acquired, in which case power is given to "apply the proceeds of the bonds * * * in making extensions and improvements to such works or plants so acquired.'' It is very evident from the terms, as well as the

spirit, of the statutes that the various words, such as "purchase," "establish," "erect," "maintain," "operate," "extensions," "improvements," "repairs," and their cognates and derivatives, though some of them have little variance in meaning, and blend into each other, are used in different senses. In Section 720, the words "purchase," "establish," and "erect," in the first sentence, are of different connotation. The word "establish" has meaning such as "originate," "institute," "set up," "found," "ordain," "constitute." Before the municipality may proceed to purchase or erect one of these utilities, its "establishment" must be authorized. This word has reference to the founding or ordaining of the enterprise, and the invocation of legal authority for it, as well as to its physical construction or acquisition. While in these statutes, as in many others, there is tautology, we are, nevertheless, of the opinion that authority "to issue bonds for the payment of the cost of establishing the same, including the cost of land * * *" is also a limitation of power; and while the word "establish" is not, in that connection, limited to the concept of merely invoking the authority of the law for construction, but necessarily includes the physical acquisition of a plant, nevertheless the authority granted to issue bonds and to use the proceeds may not be extended to purposes other than erecting or constructing a plant or purchasing and completing by extension and improvement an existing plant or parts of a plant. After the plant is once established and constructed, or (in the case of a purchased plant) completed, and the designed extensions and improvements made, the plant must thereafter be made to sustain and (if to be enlarged or extended) to pay for its own enlargement and extension. This interpretation is borne out by the terms of the authority given to cities and towns to levy taxes. They may levy a tax "to be used exclusively in payment of the principal of bonds issued for the construction of water and gas works and electric light and power plants, which tax shall not be levied upon property lying wholly without the limits of the benefit * * *" In case of waterworks, under conditions named, "to pay the expense of running, operating, and repairing * * * and the interest on any bonds issued to pay all or any part of the cost of construction, renewal, repair or extension of such works * * *" In the case of municipal gas works and electric or

power plants, a tax, with the rentals, "sufficient to pay the expenses of running, operating and repairing * * * and the interest on any bonds issued to pay all or any part of the cost of the construction of such works or plants * * *" Note in this subdivision the omission of the word "extension," contained in the waterworks subdivision. Supplemental Supplement, 1915, Section 894. Compare Code of 1927, Section 6211.

By the waterworks statute, Code of 1897, Section 749, above, the board of trustees is required to fix rates such as, with the water levy and sinking fund levy, shall be sufficient for maintenance and operation and for "the proper and necessary extension thereof, for all repairs, and for the payment of the purchase money or cost, principal and interest, incurred in the purchase or erection of such works, as the same falls due, according to the tenor of the mortgage and bonds given to secure the payment of such purchase price or cost." Code of 1924, Section 6159. This statute was made applicable to electric light and power plants by Chapters 138 and 139, Acts of the Fortieth General Assembly (Section 6816, Code of 1924), which took effect in April, 1923, before the Muscatine municipal plant was put in operation. In saying this, however, we are not to be understood at this time as definitely placing a construction on Section 6816. That the policy of the law is as has been indicated, see *Jensen v. Zurmuehlen,* 185 Iowa 593, 598. The court, in determining the purpose for which municipal indebtedness is proposed to be contracted or bonds issued, will look beyond the form of procedure adopted, and determine the real intent and purpose, whether it is to evade the law or to make illegal use of municipal bonds or funds. The purported action or project, if merely colorable, and a subterfuge, and the real purpose is evasion and law violation, if the design is to cover an illegal or unauthorized purpose or use, will be annulled, and the expenditure prohibited. *Brooks v. Incorporated Town of Brooklyn,* 146 Iowa 136; *Strahan v. Town of Malvern,* 77 Iowa 454.

We are of the opinion that the proposed new boiler, generator, and switchboard constitute merely an extension or enlargement of a completed and existing plant, and are not a part of the "establishing" authorized and undertaken in 1922, within the meaning of Section 722, Code Supplement, 1913.

It is the settled law of this jurisdiction that authority for

the issuance of negotiable bonds by a municipality must be found in express language of statute. Such power cannot be implied.  Authority to contract a particular indebtedness, or indebtedness for a particular purpose, is not authority to issue negotiable bonds for that purpose, even though, after the indebtedness is lawfully contracted, it may be refunded by the issuance of bonds. *Reed v. City of Cedar Rapids*, 136 Iowa 191; *Swanson v. City of Ottumwa*, 131 Iowa 540, and cases there cited.

The city of Muscatine is a special charter city. By its charter it may "borrow money for any object in its discretion, if at a regularly notified meeting, under a notice stating distinctly the nature and object of the loan, and the amount thereof, as nearly as practicable, the citizens determine in favor of the loan by a majority of two thirds of the votes given at the election." This provision, even though its conditions are otherwise complied with, confers no authority to issue negotiable bonds. Section 722 is applicable to special charter cities. Code Supplement, 1913, Section 952. See Code of 1927, Section 6787 *et seq.* It is quite plain that the legislature did not thereby confer power to issue bonds for making extensions and improvements of a plant erected by the municipality as an original enterprise, nor has it by the later enactments (Code of 1924, Section 6788 *et seq.*, and sections therein referred to) granted such power. The submission on December 28, 1925, to the electors of a proposition to establish an electric light plant was a sham, and the adoption of it a vain act. The submission and the adoption of the proposal to issue $100,000 of bonds were a mere nullity.

We are not to be understood as holding that a municipality may not, in good faith, construct and operate more than one utility of the same kind. That question is not before us.

Our conclusion finds support in *Bradbury v. City of Idaho Falls*, 32 Ida. 28 (177 Pac. 388). See, also, *Neacy v. City of Milwaukee*, 142 Wis. 590 (126 N. W. 8).

The wisdom of the limitation is illustrated by this case. The original referendum was not alone of the proposition to establish and erect a plant, but also of one to issue $350,000 of bonds for that purpose. While the law did not require the submission of the bond proposition, it was properly submitted, as

advisory. *Brown v. Carl,* 111 Iowa 608. The natural result of coupling the two was to give the voter to understand that the cost would not be materially in excess of $350,000. Now, before there has been any charge for depreciation (for the evidence so shows), it is proposed to make another issue of $100,000 for an additional boiler, generator, and switchboard, and this within a few weeks of the time when the plant was considered to have been completed. The increased demand for current at the start of the proceedings for additional equipment is stated to have been 200 to 250 applications. Since then it is said to be 400 or 500. If bonds are issued for this extension, then they may be issued for others. The taxpayers may find their property liable to taxation, not merely for the $350,000, but for twice that. Installations which they had reason to think would have to be made out of earnings are made out of the proceeds of bond issues, for the payment of which their property becomes liable. An enterprise that originates and is voted for as may seem in the interest of the inhabitants as consumers may thus develop into a ruinous—at least an extravagant—commercial enterprise.

Parenthetically, we may say that the vote on the propositions submitted December 28, 1925, stood 1,924 affirmative, 280 negative; while the vote cast at the preceding municipal election was not less than 5,078; and it is argued that, under Sections 6246 and 6776, Code of 1924, the affirmative vote, not being as much as a majority of all the legal votes cast at the preceding municipal election, is ineffectual. Section 6776 is editorial work, and is claimed not to be supported by the acts of the legislature to which it refers. We merely state, without passing upon, the question.

We are of the opinion that the bonds under consideration are void, and that the sale of them should be enjoined, and the bonds canceled.—*Reversed.*

STEVENS, C. J., and EVANS, ALBERT, KINDIG, and WAGNER, JJ., concur.