IOWA FARM SERUM COMPANY, Appellee, v. BOARD OF PHARMACY EXAMINERS OF THE STATE OF IOWA et al., Appellants.

No. 47321.

(Reported in 35 N. W. 2d 848)

FEBRUARY 8, 1949.

OPINION MODIFIED AND REHEARING DENIED JUNE 13, 1949.

Robert L. Larson, Attorney General, Clarence A. Kading, Assistant Attorney General, and Irving W. Myers, Special Assistant Attorney General, for appellants.

736

Stephens & Buckingham and Lehmann, Hurlburt, Hossfeld, Blanchard & Cless, all of Des Moines, for appellee.

MULRONEY, J.—The plaintiff, Iowa Farm Serum Company, was incorporated in 1940 and since that date it has held a license, issued under chapter 166, Code, 1946, to make retail sales of hog-cholera virus and anti-hog-cholera serum (hereafter called virus and serum). The sales were made through its one hundred sixteen retail outlets, though a few drugstores handled the virus and serum for the plaintiff. These retail outlets are in the Farm Bureau offices or adjacent thereto.

In June of 1947, the defendant Board of Pharmacy Examiners notified plaintiff that in its retail sales of virus and serum it was violating chapter 155, Code, 1946, in that the sales were not being conducted by or under the supervision of a registered pharmacist. The above notice called attention to the penalties as provided in chapter 155, so plaintiff, deeming itself not subject to said chapter in the conduct of its virus and serum business, brought a declaratory judgment action against the Board, seeking a declaration to that effect and injunction against the Board's threatened criminal prosecution. The Board's answer and cross-petition sought a declaration that sales of virus and serum were subject to chapter 155, providing the sales of drugs and medicine must be by or under the supervision of a registered pharmacist, and injunctive and general equitable relief. A temporary injunction was sought by plaintiff, and obtained, and upon trial the temporary injunction was made permanent; the trial court holding in its conclusion of law that since virus and serum were the subject of a special law (chapter 166, Code, 1946) the effect was that they were excepted from the statutes controlling the practice of pharmacy (chapter 155, Code, 1946).

The facts are not in dispute. The plaintiff is doing business on the co-operative plan, with virus and serum its principal sales item. In 1947, its gross sales of virus and serum amounted to $500,000. It has, as stated, one hundred sixteen retail outlets, having added forty since 1944 and each outlet has a supply of virus and serum and an electric refrigerator to keep the virus

and serum at the proper temperature. The sales outlets do not engage the services of registered pharmacists.

From the testimony of veterinarians and other experts we learn that hog cholera is a disease of swine only and it is not contracted by man or other animals. The virus and serum treatment of hogs is a preventative of and not a cure for hog cholera. In substance the method is the exposure of the animal to cholera, by hypodermically administered virus, the essence of the disease, and the simultaneous hypodermically administered serum, which is the watery portion of the blood of a hog which is immune from the disease. One veterinarian described the treatment: "We give the animal a light case of cholera and cure him at once and make him immune."

The products are each bottled in federally prescribed bottles and labelled with federally prescribed labels carrying instructions for refrigeration (not to exceed forty-five degrees) and the date when the product will, by reason of age, lose its potency—virus ninety days and serum three years.

Chapter 155, Code, 1946, is entitled Practice of Pharmacy, and the first section of the chapter (section 155.1) states that "persons who engage in the business of selling, or offering or exposing for sale, drugs and medicines at retail" shall be deemed to be "engaged in the practice of pharmacy." Section 155.3, subsection 1, in said chapter defines the terms "drugs and medicines" as "all medicinal substances and preparations for internal or external use recognized in the United States Pharmacopoeia or National Formulary, and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or animals." Section 155.6 in said chapter prohibits the sale of drugs or medicines by one not a licensed pharmacist or by one who is not under the immediate personal supervision of a licensed pharmacist. Section 155.2 excludes from the operation of sections 155.1 and 155.6 (1) persons who assist in the selling of drugs and medicines under the supervision of a licensed pharmacist (2) persons selling completely denatured alcohol or concentrated lye, insecticides or fungicides (3) persons licensed to practice medicine, dentistry or veterinary medicine who dispense drugs and medicines as an incident to the

practice of their professions, and (4) persons selling proprietary medicines or nonpoisonous domestic remedies.

Chapter 166, Code, 1946, is entitled Hog-Cholera Virus and Serum. There are thirty-eight sections in the chapter dealing with the manufacture and sale of virus and serum and instruction and permits to users under regulations and license from the Iowa Department of Agriculture. The term "biological products" is defined to mean virus and serum and "dealer" is defined as "every person who, for profit, sells, dispenses, or distributes, or offers to do so, either as principal or agent, biological products." Section 166.1, subsection 3. The department is given power to make "rules governing the manufacture, sale, and distribution of biological products as it deems necessary to maintain their potency and purity." Section 166.2. Section 166.3, provides that "every person, before engaging as a manufacturer of, or dealer in, biological products shall obtain from the department of agriculture a permit for that purpose," and the next few sections deal with the applications for manufacturers' and dealers' permits and the bonds which applicants must file. The remaining sections in the chapter deal with fees to be paid for permits, inspection of premises of permittees, revocation of permits, and permits obtained by owners of swine, after instruction, to administer the virus and serum to their own hogs. Sales by dealers are limited to persons holding permits to administer the virus and serum. Section 166.6, subsection 1, provides that the dealer's bond must be conditioned "to faithfully comply with all laws governing the warehousing, sale, and distribution of biological products, and with all the rules of the department relating to such biological products."

1. That virus and serum fall within the definition of drugs and medicines in section 155.3, previously quoted, is beyond debate. Plaintiff does not argue the virus and serum are not medicinal substances intended for the prevention of disease of animals. Its argument is that notwithstanding the fact that virus and serum might be within the terms of the statute defining drugs, still the history of the legislative enactments on both the subjects of pharmacy and drugs and virus and serum shows that virus and serum were not intended to be included in said

definition but were intended to be subject to separate regulation and control under a different department of government and were not intended to be sold at retail exclusively by a registered pharmacist or under the supervision of a registered pharmacist.

II. As we trace the history of these two chapters we think it starts, for our purpose, with the Unpublished Acts of Extra Session, Fortieth General Assembly, when the legislature enacted each chapter in its present form, and they were first published in the Code of 1924 as chapter 123, Practice of Pharmacy, and chapter 130, Hog Cholera Virus and Serum. Prior to that there had been statutes respecting pharmacy and statutes respecting hog-cholera virus and serum. Title VI, chapter 14, of the Compiled Code of 1919 is entitled "Pharmacy" and section 1412 of that chapter prohibited a "person not a registered pharmacist" from selling "drugs, medicines or poisons, or chemicals for medicinal use." But nowhere in the chapter was there any definition of drugs or medicines. Most all of the sections of chapter 14, Title VI, of the Compiled Code were repealed and a new practice act enacted by chapter 167, Acts of Fortieth Extra General Assembly (Unpublished Acts). Here for the first time the legislature defined what constituted practice of pharmacy, and defined drugs and medicines as heretofore set out in section 155.3, Code, 1946.

Title VIII, chapter 17, of the Compiled Code of 1919 is entitled "Hog Cholera Serum and Other Biological Products." This is a short chapter of six sections giving the commission of animal health the power to make "rules and regulations governing the manufacture of serum and other biological products for use on domestic animals" (section 1778) and providing that a person should receive a permit from the commission of animal health before selling anti-hog-cholera serum. It does not appear that a permit to sell the virus was necessary but there is a prohibition in the chapter against anyone selling the virus except to persons who held permits to use it. Without pointing out further differences we will state that the law as it stood in chapter 17, Title VIII, of the Compiled Code of 1919 was thoroughly rewritten by the legislature in the Fortieth Extra Session of the General Assembly, which in chapter 46 (Unpublished Acts)

740

enacted the chapter published as chapter 130, Code, 1924—the present chapter 166 of the Code of 1946.

There is no merit in plaintiff's argument that the virus and serum law is a later law because the first hog-cholera serum law was enacted in 1909 (chapter 151, Acts of Thirty-third General Assembly) and at that time there was a statute defining drugs in the Code of 1907, section 4999-a23, which is substantially the same as section 155.3, Code of 1946. The statute plaintiff refers to is chapter 176, Acts of Thirty-second General Assembly, but this is the antecedent statute to the present section 203.1, Code, 1946, found in chapter 203 which is entitled "Adulteration and Labeling of Drugs", and the definition was confined to the term drugs as used in that chapter, then called Pure Drugs. The fact remains there was no statute defining drugs and medicines in the pharmacy act until the Fortieth Extra Session of the legislature in 1924.

██ ██ We see nothing in the foregoing historical investigation of chapters 155 and 166 which shows a legislative intention that one should supersede the other or that the regulations contained in chapter 166 should be exclusive of the regulations contained in chapter 155. It is not necessary to cite a multitude of authorities to the effect that where there are two statutes relating to the same subject matter they should be construed, if it can be done, so that both may have full force and effect. But see Schoenwetter v. Oxley, 213 Iowa 528, 239 N.W. 118; Iowa Elec. Co. v. Scott, 206 Iowa 1217, 220 N.W. 333; Ogilvie v. City of Des Moines, 212 Iowa 117, 233 N.W. 526; Iowa Motor Vehicle Assn. v. Board of Railroad Commrs., 207 Iowa 461, 465, 221 N.W. 364, 366, 75 A. L. R. 1. We said in the last above cited case:

██ "The rule that statutes *in pari materia* shall be construed together applies with peculiar force to statutes passed at the same session of the legislature."

██ We see no reason why both chapters cannot be given full force and effect according to the plain language contained in each. As we have stated it is abundantly clear that virus and serum are drugs and medicine within the definition of section 155.3. The seller of drugs and medicines must be a pharmacist

or one who is selling under a pharmacist's supervision unless he is in the class of the enumerated exclusions of section 155.2. There is no argument here that the seller of virus and serum is within the exemptions of section 155.2. Chapter 166 does not create any additional exception. It merely provides that every person, before engaging as a retailer of serum or virus, must secure a permit from the Iowa Department of Agriculture and abide by the regulations of that department. There is no conflict between the statutes. We cannot read into the chapter on the practice of pharmacy another exclusion. The legislature in enacting either chapter could have excluded the virus and serum dealer from the pharmacy practice act but this court cannot write in such an exclusion. In plain, unambiguous language in the two laws the legislature has, in effect, said the dealer in drugs shall be a pharmacist and the dealer in virus and serum shall obtain a permit from the Iowa Department of Agriculture. The latter is supplementary to the former. They are not repugnant because of the dual control. Indeed the business life of a retailer in this land of free enterprise is rich in controls. Before he can embark in the retail business in this state he must first secure a permit from the State Tax Commission (section 422.53, Code, 1946). Should he desire to serve food he must secure a license from the Department of Agriculture (section 170.2, Code, 1946). If he would sell or serve beer he must first obtain a proper permit from the State Permit Board, composed of the chairman of the State Tax Commission, the Secretary of State and the Auditor of State (section 124.1, Code, 1946). And if he desires to sell cigarettes he would first have to secure a permit from the city or county and the State Tax Commission. His business premises might be subject to inspection for fire hazards by both the State Fire Marshal and the Department of Agriculture. Chapters 100 and 170, Code, 1946.

Business and governmental regulations march close together on the highway of our economic system and it matters not that several government departments are vested with regulatory powers over a single business.

III. The plaintiff points to the executive and legislative interpretation for the past thirty-eight years, to the effect that

sales of virus and serum by or under the supervision of a pharmacist has not been required, and it has never been a prerequisite for obtaining a permit under chapter 166 that the applicant be a pharmacist or that he show that sales of virus and serum would be under the supervision of a pharmacist. The record is not too clear on this point but it does fairly appear that prior to the notice of the Pharmacy Board in this case no contention was ever made by the Pharmacy Board or the Department of Agriculture that sales of virus and serum would have to be by a pharmacist or under his supervision. The record also shows that many pharmacists did, in the past, secure permits to sell virus and serum under chapter 166. The argument seems to be that the government departments have not interpreted the two laws as requiring compliance with the pharmacy practice act in order to retail virus and serum, and the legislature by not amending the law in some manner to make it plain such compliance was necessary has in effect displayed a legislative intent that the requirement was not necessary. The plaintiff cites John Hancock Mut. L. Ins. Co. v. Lookingbill, 218 Iowa 373, 253 N.W. 604, and cases 'of similar import holding to the rule that executive construction of a statute and legislative inaction in the face of such construction, will, especially when vested rights are involved, be entitled to great weight in the search for legislative intent.

Little need be said in answer to the argument. All authorities agree that the rule with respect to executive construction is restricted to the cases in which the meaning of the statute is really doubtful. 59 C. J., Statutes, section 610. Plaintiff recognizes this for in his brief point he first states the "construction being necessary because of doubt, ambiguity and lack of clearness and definiteness of expression as to whether or not virus and serum are drugs such as to require their retail sale by a registered pharmacist or under the supervision of a pharmacist." The entire argument is answered by our first division. We find no doubt, ambiguity, or lack of clearness as to whether virus and serum are drugs. The department heads, by their mere failure to enforce, will not engraft a fifth exclusion in the pharmacy practice act, as to dealers in virus and serum.

The same can be said with respect to the legislative con-

struction. We know of no authority for holding that a legislative intent or policy emerges by reason of legislative inactivity in the face of continued unenforcement of a plain unambiguous law. Whatever might be said for the departmental interpretation, before the Fortieth Extra General Assembly in 1924 placed the all-embracing definition of drugs and medicines in the pharmacy practice act, it is clear that departmental construction after that date would not show the Fortieth General Assembly *intended* to exclude virus and serum from that all-embracing definition and the fact that succeeding legislatures failed to enact legislation that would specifically exempt virus and serum from the all-inclusive definition does not remotely suggest that any legislature has held the view that virus and serum are not drugs. United States y. South-Eastern Underwriters Assn., 322 U. S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440.

IV. Finally we are told, in plaintiff's brief, that the rational and common-sense construction, in the light of the need for the law and the evils sought to be corrected, is that there should be no requirement that sales of virus and serum be by or under the supervision of a pharmacist; that public welfare, convenience and necessity do not require such a construction. Plaintiff argues that the only care needed for the preservation of the potency of the virus and serum is refrigeration and that no more intelligence is needed than ."to sell ice cream or photographic film"; that the dealers need only "watch the temperature and see that the product isn't out of date."

██ The same argument could probably be advanced for an exemption from the pharmacy practice act of drugs of far less potency than those here involved. Perhaps the sale of aspirin would require less intelligence. But the test is not the knowledge and training necessary in the handling of a certain drug. The legislature, out of solicitude for the public, has said if the product is a drug or medicine, then the retailer must be a man trained in the handling of drugs and medicines or a pharmacist. The public policy is announced by the legislature, not the courts. This court is not free to assume the public will be adequately protected if the requirement for pharmacist sales of these drugs is eliminated. Even had we the power we would be loath to exercise

it in this case where one of the products is the very essence of the disease of hog cholera and the other its cure. Let one become impotent by improper handling at the dealer level and you have the possibility of a farmer giving his herd cholera instead of preventing it, or of his failing to immunize the herd.

Defendant Board in its cross-petition prayed for a decree declaring virus and serum are drugs and retail sales can only be made by or under the immediate personal supervision of a registered licensed pharmacist. Defendant is entitled to such a decree of declaration. The judgment and decree of the trial court is reversed and the case is remanded for the entry of the above decree.—Reversed and remanded.

All JUSTICES concur.