RAY BAIRD et al., appellees, v. CITY OF WEBSTER CITY et al., appellants, and NORTHERN NATURAL GAS COMPANY, appellee.

No. 51248.

(Reported in 130 N.W.2d 432)

1100

SEPTEMBER 22, 1964.

M. Gene Blackburn, City Attorney, of Webster City, and Alan Loth, of Fort Dodge, for appellants.

Burnquist, Burnquist & McCormick, of Fort Dodge, for plaintiffs-appellees.

Hemingway & Hemingway, of Webster City, for Northern Natural Gas Company, appellee.

THORNTON, J.—Plaintiffs are taxpayers and consumers of natural gas in Webster City and bring this action for themselves and others similarly situated. Defendant Northern Natural Gas Company, hereinafter referred to as the utility, retails natural gas in Webster City. Defendant city, its council and treasurer will be referred to as the city.

In 1920 a gasworks was established in Webster City by a vote of the people. In 1944 pursuant to a vote of the people the

city leased the distribution system of its gasworks to the utility (the fact the present utility is a successor to the original lessee is disregarded) for a term of 15 years and granted it a 25-year franchise to sell gas. The lease provided for the payment of $75,000 in annual installments of $5000, for the conversion by the utility at its expense of the distribution system from one for manufactured gas to one to handle natural gas, and all substitutions or betterments of the system not distinguishable should be considered and held to be renewals and replacements and any extensions, improvements and additions to the leased system and distinguishable from it were to be owned by the utility. Such extensions were to consist of new mains, pipe and service connections and installed for the purpose of servicing new and additional customers and not in renewal or replacement of existing mains and pipe. The city was given an option to purchase such extensions at the end of the term by giving 12 months notice of its intention to do so. If the option was not then exercised the lease was to continue on a year-to-year basis not exceeding ten years with the continuing right to exercise the option. The price was the actual cost of such extensions less 2½ percent depreciation per annum.

The lease was carried out, the utility through the years made distinguishable extensions at the undepreciated cost of a little over $477,000. The city estimated the price at $350,000.

In December 1960 electors filed a petition with the mayor requesting an election on the question of whether the city should sell its system to the utility for at least $134,869. The trial court held this petition was superseded by the later one to extend the lease. This ruling is not questioned here.

In 1946 when natural gas was introduced there were 1252 meters with 301 heat customers. At the end of 1962 there were 3037 meters with 2820 heat customers.

May 15, 1961, the council passed a resolution to terminate the lease and exercise the option on August 15, 1962, and so notified the utility. In October 1961 and again in January 1962 the council submitted to the voters the question of approving a contract for the purchase of natural gas for a 15-year term commencing August 16, 1962. Both times the proposal was turned

down. In January 1962 the council by ordinance set up a gas department. In March of 1962 the council by resolution transferred funds from the electric account to the gas account within the same functional fund, this action was implemented August 13, 1962, by motion to tender $350,000 to the utility in performance of the option. An attached table showed $220,000 of the $350,000 tendered was transferred from the electric to the gas account within the utility fund. It was stipulated that prior to 1951 the gas funds and other utility funds were recorded separately. After the 1951 legislation (chapter 159, Laws of Fifty-fourth General Assembly; chapter 404, Code of Iowa, 1962) all these funds were combined into a single fund, known as the utilities fund. For convenience the receipts from each utility were kept track of separately within that fund.

This suit was started August 9, 1962. On August 15 the city tendered its warrant drawn on the utilities fund for $350,-000 to the utility in performance of the option, this was refused. On August 15, 1962, a petition by a proper number of electors was filed with the city clerk addressed to the mayor requesting a special election on the question of extending the 1944 lease with the utility until August 16, 1969. On the same date a temporary injunction was issued as prayed.

The city proposes to buy the utility's share of the gas distribution system for cash, two-thirds of which was transferred from the electric fund, and commence operating the entire system, all without any elections. Plaintiffs, with whom the utility joins, seek to enjoin such action until authorized by elections and the approval of the comptroller to transfer funds. All parties ask declaratory relief.

After trial the trial court quieted title to the original gas distribution system with indistinguishable repairs and betterments in the city and to the rest of the system in the utility subject to the city's option.

The trial court further held it was necessary for the city to hold elections on the questions of (1) operating the system, (2) purchasing the part owned by the utility, and (3) purchasing gas at wholesale for resale.

The trial court further held the mayor must call an election

on the question of extending the lease. Also the acts of the city in attempting to take over the gas distribution system were invalid and enjoined it from proceeding until there was an affirmative vote by the electors on the questions of operating the entire system, purchasing the utility's portion of it, and on purchasing natural gas at wholesale with approval of the Federal Power Commission if required. After compliance the city was ordered to continue service to gas customers as rendered by the utility before.

Upon compliance with the foregoing by the city the utility was ordered to convey its part of the system and deliver possession of the entire system to the city. In the meantime the utility was ordered to remain in possession and operate under the terms of the lease and franchise and enjoined from ceasing to provide gas service until delivery of possession of the system.

Neither party complains of the quieting title. No question is raised as to the validity of the option.

The city appeals from all parts of the decree adverse to it. Plaintiffs and the utility attempt to sustain the trial court's order relative to the purchase of natural gas on the basis of the necessity of prior approval by the Federal Power Commission.

I. The city urges the powers of the city should be liberally construed to confer broad and implied powers pursuant to chapter 235 of the Sixtieth General Assembly effective July 4, 1963, after this trial. This amendment to section 368.2, Code of Iowa, 1962, so provides. However it is not helpful to the city because there is no question the city of Webster City has the powers it wishes to exercise here. The questions here, as pointed out by the trial court, are ones of procedure. The questions are whether to exercise these powers it is necessary to obtain the approval or authority from the electors, and which statutes it is necessary to follow to transfer funds. In this regard chapter 235, Sixtieth General Assembly, lines 17–21, provides:

"However, statutes which provide a manner or procedure for carrying out their provisions or exercising a given power shall be interpreted as providing the exclusive manner of procedure and shall be given substantial compliance, * * *."

1104

 Unless otherwise required by statute, when a municipality exercises its powers to make an improvement or a contract it acts through its council by ordinance or resolution. Section 363.3 and section 368.2, Code of Iowa, 1962. "Unless restrained by statute a municipality may in its discretion determine for itself the method of exercising powers conferred upon it." City of Des Moines v. Reiter, 251 Iowa 1206, 1212, 102 N.W.2d 363, 367. Unless required by statute a popular vote is not necessary for the making of a municipal contract or a municipal improvement. Miller v. Incorporated Town of Milford, 224 Iowa 753, 768, 276 N.W. 826, 114 A. L. R. 1423; and 63 C. J. S., Municipal Corporations, section 994, pages 562, 563, section 1066, page 703.

 We should point out, as the trial court did, that we are not and cannot be concerned with policy considerations or the wisdom of the actions taken or proposed, or the legislation involved. See Gade v. City of Waverly, 251 Iowa 473, 101 N.W.2d 525. Also that the people of the community are entitled to service at all times.

II. With the above in mind, we turn first to the necessity of an election to operate the system. No statute is pointed out as requiring such an election.

Section 397.1, Code of Iowa, 1958 (applicable to this case, the pertinent sections are the same in the 1962 Code), provides:

"Cities and towns shall have the power to purchase, establish, erect, maintain, and operate * * * gasworks * * * with all the necessary reservoirs, mains, filters, streams, trenches, pipes, drains, poles, wires, burners, machinery, apparatus, and other requisites of said works or plants, and lease or sell the same."

Section 397.4 provides: "They may enter into contracts with persons, corporations, or municipalities for the purchase of heat, gas, water, or electric current for either light or power purposes, for the purpose of selling the same either to residents of the municipality or to others, including corporations, and shall have power to erect and maintain the necessary transmission lines therefor, either within or without their corporate limits, to the same extent, in the same manner, and under the same regulations, and with the same power to establish rates and

collect rents, as is provided by law for cities having municipally owned plants."

Section 397.5 provides: "No such works or plants shall be authorized, established, erected, purchased, leased, or sold, or franchise granted, extended, renewed, or amended, or contract of purchase provided for in section 397.4 shall be entered into unless a majority of the legal electors voting thereon vote in favor of the same; * * *."

Whether we consider the distribution system here as "transmission lines" in section 397.4 or a plant or works in section 397.1, the result is the same. The legislature equates transmission lines with municipally owned plants in section 397.4 as far as operation is concerned and in Poor v. Incorporated Town of Duncombe, 231 Iowa 907, 919, 920, 2 N.W.2d 294, we held an electrical distribution system to be a plant within the meaning of that term as used in section 397.9.

Sections 397.1 and 397.4 grant powers relative to municipalities. Section 397.5 requires elections authorizing the exercise of certain of these powers. "Operate" is not included in section 397.5.

It is argued the electors terminated the city's power to operate the system by the election approving the lease and franchise in 1944. They voted on two questions, the lease and the franchise. The lease set out in full on the ballot contemplated the return of the system with the extensions and additions in the meantime. Of course the lease had the effect of terminating the city's operation during the term of the lease, nothing more.

Nor does chapter 11, Laws of the Twenty-second General Assembly, 1888, the forerunner of sections 397.1 and 397.5, insofar as gasworks are concerned, set up a policy of the electors deciding between private or public operation. Section 1 of chapter 11, Twenty-second General Assembly, granted cities and towns power "to establish and maintain gasworks." Section 4 thereof provided, "* * * no such gasworks * * * shall be established * * * until a majority of the legal voters * * * decide in favor of the same." It will be noted "operate" did not then appear in the statute. "Operate" first appeared in the Code of 1897.

III. The power to exercise the option and purchase the utility's part of the system turns on whether this in truth and in fact amounts to the purchasing of a plant. If it does an election is required. If it does not none is required. This is a question of fact. The trial court decided it was in fact purchasing a plant. Our review is de novo. It is our duty to reexamine the evidence bearing on this question.

In 1944 the city had a gasworks, it leased the distribution system and sold the manufacturing plant. The lease of the distribution system provided for the improvement of the system to handle natural gas and provided for extensions and additions to take care of additional customers. The record is clear nothing was done that was not necessary to give adequate gas service to the additional customers. The number of heat customers increased from 301 in 1947 to 2820 in 1962, from 1252 meters in 1947 to 3037 in 1962. The amount expended by the utility through the years 1946 to 1962, both inclusive, in round numbers is $477,000. The largest amount was expended in 1946, $66,000, the smallest in 1962, $10,000, the average yearly amount about $33,000. Some indication of the value of the two parts is found in the city's tender of $350,000 to take up its option to purchase the utility's part, and the figure of $134,000 for the city's part. This figure is found in the petition of the electors filed with the council proposing an election on the sale of the city's part to the utility. No expert testified to these values. However, from the entire showing in the record on the size and extent of the parts of the system owned by the city and utility it is clear the utility's part is at least two and one-half times larger than the city's. This factor coupled with the conversion of the city's part from manufactured gas to natural gas appears to be the reason for decision by the trial court. And it is perhaps true the utility's part could be severed from the city's and operated as a separate system. However, this is not what was done. The 1944 lease provided for the change of the city's part to handle natural gas, this part to be owned by the city, and for extensions, improvements and additions, to be owned by the utility, for the purpose of serving new and additional customers. The city was given the option to purchase the extensions, improvements and additions. The lease

contemplated starting with the city's distribution system, adapt it to handle natural gas, and then add on as necessary to handle additional customers. This is what was done. The city had a system and necessary additions have been made to it at an average cost of about $33,000 per year. The city's part and the utility's part have always been used as one system, such is the contemplation of the lease and the import of the testimony of Mr. Harold D. Stark who stated he had been "engaged full time in the gas business at Webster City for Northern since 1946." The utility's part is not a separate plant. The city had a plant or system, and still does; what the city proposes to purchase in taking up its option are extensions, improvements and additions.

In prior cases we have dealt with a similar question. In Mote v. Incorporated Town of Carlisle, 211 Iowa 392, 233 N.W. 695, an election was held to authorize the erection of a waterworks for $27,000. After the money was expended the plant was not completed or erected, and the plans were extended without a vote of the people to include a deeper well and more mains. No completed waterworks was established until the completion of the works as changed. We there said, pages 398 and 399 of 211 Iowa, page 698 of 233 N.W.:

"The extensions of the mains were all installed before the well was completed, and hence those mains were extended before, and not after, the waterworks were completed and erected. That being true, all the work done, including both that authorized and that unauthorized by the election, was part of the establishment and erection of the waterworks. * * * Even though the original proposition was voted upon, the additional expenditures were launched for the purpose of completing the original establishment and erection. Consequently the second work installed amounted to the establishment and erection of the waterworks, just the same as the first undertaking. * * * a vote was imperative * * *."

In Muscatine Lighting Co. v. City of Muscatine, 205 Iowa 82, 217 N.W. 468, we held a bond issue invalid under then applicable statutes because issued for extensions and improvements and not to establish, erect or purchase. In that case the city had erected and used a light plant, the additions and improvements

to be financed were an additional boiler, generator and switchboard to serve additional customers. The argument these additions were part of the original establishment was turned down.

Though the plaintiffs and the utility contend Chitwood v. Lanning, 218 Iowa 1256, 1258, 257 N.W. 345, is inapplicable here because it is proposed to use earnings of the electric plant and not only past and future earnings of the gasworks, it is authority extensions, improvements and additions may be made without an election.

The above Iowa cases tend to support our conclusion the proposed purchase of the utility's part of the system is not the establishment or purchase of a plant, but merely the purchase or payment for extensions, improvements and additions made to service additional customers under the lease. No statute requires an election to make, pay for, or purchase such.

Also as supporting our view, see White v. Welsh, 291 Mich. 636, 289 N.W. 279, where a 30-mile pipeline costing four million dollars was held to be an extension of the existing water system; Veldman v. City of Grand Rapids, 275 Mich. 100, 265 N.W. 790, 794, where the purchase of an additional power plant was not acquiring a public utility but was only the extension of an existing system; State ex rel. City of Fostoria v. King, 154 Ohio St. 213, 94 N.E.2d 697; Indiana Service Corporation v. Town of Warren, 206 Ind. 384, 189 N.E. 523; and Slepicka v. City of Wilber, 150 Neb. 376, 34 N.W.2d 646.

IV. An election is required to authorize the city to buy natural gas for resale. This is true because it is required by statute. Section 397.5 provides, "No * * * contract of purchase provided for in section 397.4 shall be entered into unless a majority of the legal electors voting thereon vote in favor of the same; * * *."

Section 397.4 provides: "They may enter into contracts with persons * * * for the purchase of * * * gas * * * for either light or power purposes, for the purpose of selling the same either to residents of the municipality or to others, * * *."

The city urges the above is inapplicable to it because it proposes to purchase gas on a day-to-day, pay as you go basis like any member of the public takes gas from the public service com-

pany. It contends the above sections apply only to long-term contracts for fixed or minimum quantities on a contract price which may be suitable for resale beyond its requirements, not to present sales. That it has the power under section 397.1 to procure or buy "requisites" for its gas system. And further that if an election is necessary the 1944 election authorizing the lease of the system is sufficient.

■ The city's arguments cannot be accepted. A present purchase or a present sale is a contract. Williamson v. Berry (1850), 8 How. (49 U. S.) 495, 543, 12 L. Ed. 1170, 1191, states "that *sale* is a word of precise legal import, both at law and in equity. It means at all times, a contract between parties, to give and to pass rights of property for money—which the buyer pays or promises to pay to the seller for the thing bought and sold." The same definition is found in 77 C. J. S., Sales, section 1, page 575. See also Salada Beach Public Utility Dist. v. Anderson, 50 Cal. App.2d 306, 123 P.2d 86, 87; Curtis v. O'Leary, 131 F.2d 240, 245; and Words and Phrases, Perm. Ed., Volume 9, Contract, and Volume 38, Sale.

That what the city proposes to do is a contract there is no doubt. The question is, is it included in section 397.4 and section 397.5? We think it is.

The city also urges the words, "contracts for the purchase of gas," as used in section 397.4 are equivalent to "contract to sell" as used in section 554.1. In section 554.1, subsection 1, "a contract to sell" is defined as a contract whereby a seller agrees to transfer property in goods, in subsection 2 a "sale" is defined as an agreement whereby the seller transfers property in goods. The first is in the future, the second is in the present. Both are contracts. The word "for" as used in section 397.4 is not used in the sense of purchasing in the future but in the sense of purpose. The language used makes this clear. It grants power to enter into "contracts with persons," etc., next, the purpose of, or kind of contract, is pointed out, "for the purchase of * * * gas," next, the purpose or use to be made of the gas, "for either light or power purposes," and next, the purpose to which the gas may be put, "for the purpose of selling the same either to residents * * * or to others."

We think this section contemplates any contract the purpose of which is to buy gas for resale whether title to the gas is to pass in the future or presently. Any other construction would reduce the statute to an absurdity. Continual purchases could be made without authorization, this is not the import of the statute. Hardwick v. Bublitz, 253 Iowa 49, 53, 111 N.W.2d 309; and In re Estate of Klug, 251 Iowa 1128, 1132, 104 N.W.2d 600.

Whether or not section 397.1 granted the power to purchase gas for resale to residents when the language of section 397.4 was added to it in section 720, Supplement of 1913, and then separated by the Fortieth General Assembly, Extra Session, we now have an enactment speaking as if enacted at the same time that places a contract for the purpose of resale to residents in the same class with "to others" insofar as requiring an election. ·

The 1944 election did not include this question. The public measure submitted to the people was, in brief, Shall the city lease to the utility the gas distribution system owned by the city for a rental of $75,000 payable, etc., with an option to the city to purchase any and all extensions, that said utility will use all reasonable and due diligence to the end that natural gas in lieu of manufactured gas shall be sold in said city by said utility as soon as war restrictions, etc., will permit, all as shown by the lease set out?

 It is urged authority to make the lease with its provisions for an option necessarily authorizes the purchase of gas to make the contemplated result possible. The difficulty with this argument is there is nothing in the public measure to indicate or advise the voter of the course to be pursued at the end of the lease. It could be either another lease or operation by the city. A public measure should be sufficiently definite to apprise the voters with substantial accuracy of what they are called on to approve. 63 C. J. S., Municipal Corporations, section 1066, page 706; Pennington v. Town of Sumner, 222 Iowa 1005, 270 N.W. 629, 109 A. L. R. 355, and citations; Drummond v. City of Columbus, 136 Neb. 87, 285 N.W. 109; and Wisconsin Power & Light Co. v. Public Service Commission of Wisconsin, 224 Wis. 286, 272 N.W. 50. The proposition submitted in the 1944 election did not apprise the voters they were authorizing

a contract for the purchase of gas at the end of the lease, nor is such necessarily included in the proposition.

V. The city has transferred $220,000 from the earnings of the electric plant to the gas account within the utilities fund and tendered $350,000 to the utility by warrant drawn on the utilities fund to take up its option to purchase the extensions, improvements and additions. The tender was refused.

The trial court held sections 397.38 and 397.39 were both applicable. The plaintiffs and the utility do not contend here section 397.38 is applicable but insist section 397.39 is.

Section 397.39 provides: "Any city or town having a surplus earned from the operation of a municipal heating plant, waterworks, gasworks, or electric plant, and which has no bonded indebtedness against any such plant or which has sufficient funds on hand to provide for the current year's interest and principal and the succeeding year's interest and principal may on approval of the state comptroller transfer the surplus earnings of such utilities to any other fund of the municipality."

This section was originally adopted in 1927 by the Forty-second General Assembly, chapter 157. It was last amended in 1951 by the Fifty-fourth General Assembly, chapter 165, section 50, to delete, "including cities under special charter."

The Fifty-fourth General Assembly, chapter 159 (1951), repealed former chapter 404 of the Code and enacted a substitute therefor, as it now appears. This was pursuant to a report of a legislative study committee. The title to chapter 159 stated it was AN ACT relating to taxation and other sources of municipal revenue.

The pertinent sections in chapter 404 are:

Section 404.2 authorizing municipal corporations to establish functional funds as provided in sections 404.6 to 404.12 inclusive.

Section 404.12 sets up the utilities fund, this fund includes all money of the waterworks, gas, electric or power plant. The proceeds therein may be allocated for any purpose relating to municipal utilities specifically authorized by law.

Section 404.4 provides the council shall in January allocate by resolution the estimated revenues. "Said allocations shall

also include receipts from sources other than taxation, \* \* \*."
The section further provides the books of the corporation shall
reflect:

"1. The nature and amount of each sum received and expended in each functional fund.

"2. The total amount appropriated in each functional fund.

"3. The total amount appropriated in each of the divisions
or accounts within each functional fund as set forth in sections
404.6 through 404.12.

"4. The unexpended balance remaining in each functional
fund and in each division or account within such functional
fund."

Section 404.5, in part, provides: "Municipal corporations
may fit their income to their needs in the following ways: \* \* \*

"3. By subsequent resolution of the council amending such
allocations within any functional fund to fit actual income to
the authorized purposes of such functional fund, as the need
arises, \* \* \*.

"4. By transfers from one functional fund to another in the
manner provided by chapter 24, or by creating an emergency
fund in the manner provided by that chapter.

"5. By transfers of surplus from the debt service fund, as
provided by section 404.21, subject, however, to the approval of
the state comptroller. \* \* \*."

Section 404.14 provides for separate allocations within each
functional fund for each purpose.

 The purpose of chapter 404 is to reduce the number
of municipal funds from 164 to nine functional funds and to
allow flexibility in handling the financial needs of the various
activities of municipal government. See Alexander v. Town of
Montezuma, 243 Iowa 251, 254–256, 51 N.W.2d 456.

 It was stipulated the city combined all its utility accounts into a single fund known as the utilities fund after the
enactment of chapter 404 in its present form, and that the city
did not obtain approval of the state comptroller for the transfer
of funds.

Section 397.39 provides the city may transfer a surplus
earned from operation of a utility to any other fund, on condi-

tion of having no bonded indebtedness, or funds to take care of the bonded indebtedness for the current and the succeeding year with the approval of the comptroller. We are dealing with a surplus earned from a utility, but the question is, are we dealing with a transfer to "any other fund"? The city has adopted the plan of chapter 404 as far as the utilities are concerned. It no longer has funds for each utility, but accounts within a functional fund as contemplated by sections 404.2 and 404.6 to 404.12. It has allocated earnings of the electric plant within the utilities fund to the gas account. Before the enactment of chapter 404 in 1951, a transfer from an electric fund to a gas fund would have been controlled by section 397.39. But does it follow when the legislature has authorized the city to set up functional funds including earnings from all utilities and has authorized allocations of accounts within the functional fund, that such an allocation is still covered by section 397.39? We think not.

▇▇ ▇▇ Plaintiffs and utility contend section 397.39 is a special statute and the provisions of chapter 404 are general and that when a general and special statute conflict the special controls. This is partially true, when a general and special statute are in conflict and cannot be reconciled the special one prevails. Andreano v. Gunter, 252 Iowa 1330, 1335, 110 N.W.2d 649; Shelby County Myrtue Memorial Hospital v. Harrison County, 249 Iowa 146, 153, 86 N.W.2d 104, and citations; and 82 C. J. S., Statutes, section 369, page 844. The general rule is, prior and later statutes dealing with the same subject matter although in apparent conflict, should, as far as reasonably possible, be construed in harmony with each other so as to allow both to stand and to give force and effect to each. 82 C. J. S., Statutes, section 368, page 836; Board of Park Commissioners of City of Marshalltown v. Marshalltown, 244 Iowa 844, 850, 58 N.W.2d 394; Fitzgerald v. State, 220 Iowa 547, 553, 260 N.W. 681, 683; and Iowa Farm Serum Co. v. Board of Pharmacy Examiners, 240 Iowa 734, 35 N.W.2d 848.

These statutes, section 397.39, "transfer * * * to any other fund" and section 404.5, subsection 3, "allocations within any functional fund to fit actual income to the authorized purposes of such functional fund," are not actually in conflict. Section

397.39 now deals with the funds that exist now. Such a transfer could not be made to another functional fund without complying with section 397.39. Section 404.5, subsection 3, authorizes the allocation from an electric account to a gas account within the utilities fund. This construction of these statutes gives effect to both. To construe them as contended for by the plaintiffs and the utility would entirely defeat the legislative plan providing for flexibility of fitting municipal income to municipal needs insofar as utilities are concerned.

The allocation of funds here is proper and authorized by section 404.5, subsection 3.

VI. The city contends the trial court was in error in entering an order in mandamus ordering the mayor to call an election on the petition of the electors filed on August 15, 1962, calling for an extension of the lease. ·The petition proposed the lease authorized in 1944 be amended and extended to continue until August 16, 1969, and made provision for the city to exercise its option to purchase extensions, improvements and additions subject to a vote of the electors in 1968. A proposed copy of the extension agreement was included in the petition.

Unless further circumstances appear, section 397.6 casts a mandatory duty on the mayor to call the election on a proper petition of the voters enforceable by mandamus. An affirmative vote authorizes the council to act but does not require it to act. Iowa Public Service Co. v. Tourgee, 208 Iowa 36, 222 N.W. 882; Iowa Public Service Co. v. Tourgee, 208 Iowa 198, 225 N.W. 372; and Incorporated Town of Mapleton v. Iowa Light, Heat & Power Co., 206 Iowa 9, 216 N.W. 683.

Plaintiff in mandamus must not only show the mayor was under an obligation to call an election but also a basis for the court controlling such by mandamus. The issuance of a writ of mandamus is not a matter of absolute right but rests in the discretion of the court. Iowa Power & Light Co. v. Hicks, 228 Iowa 1085, 1093, 292 N.W. 826. Where the petition of the electors does not propose a question required by statute to be submitted to a vote the writ should, of course, be refused. Likewise it should be refused when its issuance as prayed will create disorder or confusion. 55 C. J. S., Mandamus,

section 142e, page 236; 34 Am. Jur., Mandamus, section 40, page 833; and where the proposed act is unlawful or unconstitutional. State ex rel. Cranfill v. Smith, 330 Mo. 252, 48 S.W.2d 891, 81 A. L. R. 1066.

The proposal here to amend and extend a lease is not one for which an election is required under section 397.5. "Leased" is all that appears in the section. To amend or extend a lease is a question for the council. See authorities cited in Division I. This is a sufficient ground to deny relief here.

Under the terms of the lease authorized and entered into the council already had the power and authority to do exactly what was proposed. The council needed no further authority. The council did however terminate the lease. As we read the trial court's findings it so found and we agree. If we now construe the petition filed as proposing a new lease extending to August 16, 1969, with some variation in the option we are confronted with this situation. The old lease is terminated to the part of the system owned by the city. The petition only proposes to lease this part. The city has exercised its option to the part of the system owned by the utility and we have determined it may properly use the funds proposed to pay the utility. If this transaction is completed the city will own the entire system as now constituted. Authority to lease a portion of it would be of no value. Nor would it be of value during a transitional period from operation by the utility to operation by the city if that takes place. Under these circumstances we will not place the expense of an election on the taxpayers of Webster City.

VII. The city next complains of the utility being placed in possession. The only evil in this order of which the city can justly complain, in view of the utility's duty to furnish service to those entitled to it until other service is available, Abbott v. Iowa City, 224 Iowa 698, 277 N.W. 437, is the question of fair rental during the period from the termination of the lease until the system is finally delivered to the city. In the event the city and the utility cannot agree the trial court has jurisdiction to determine further questions necessary to carry out the decree, one of the matters properly determinable by it is the fair rental

value of the distribution system during the period it is used by the utility. The city has accepted the sum of $5000 for the year ending August 16, 1963, for the old part of the system owned by the city, this amount need not be reexamined. The matters properly to be determined include any period for which the city has not voluntarily accepted rentals insofar as the part of the system originally owned by the city is concerned, the fair rental value of the part owned by the utility subject to the city's option from the date of the tender, August 15, 1962, with adjustments for any interest properly due the utility. The 1944 lease calls for arbitration of the amount of the option price. If the amount tendered is disputed and the parties so agree this may be determined by the trial court.

 VIII. The city complains because the decree does not require the utility to furnish natural gas for the system when it is taken over by the city. The plaintiffs and the utility resist in part because under the record Northern would not necessarily be the pipeline supplier. We do not believe the record warrants such finding. Northern pleaded an agreement between Northern and the city was necessary to obtain gas under the rules of the Federal Power Commission. Mr. Stark, its witness, testified, "The source of this gas supply is and has always been the Northern's pipeline." The only fair inference is, Northern is the pipeline supplier under the record. The city prayed, "That Northern be required * * * to continue to furnish gas for the system * * *."

In this regard the trial court's conclusions of law do contain the following, though the same were not carried in full in the decree, "* * * if the city (3) properly provides the financing so to do, then it will be necessary for the city and Northern Natural Gas Company to come together upon an agreement for a supply of gas and to secure approval thereof by the Federal Power Commission if required." The foregoing should be fully expressed in the decree. It requires Northern to continue to supply gas for the system when the city takes over. The trial court also properly refused to enter the jurisdictional area of the Federal Power Commission by requiring the city and Northern, "to se-

cure approval if required." As having some bearing see Peoples' Gas & Electric Co. v. Herme, 242 Iowa 894, 46 N.W.2d 551.

IX. The city further complains the decree required it to continue service to customers "as rendered by the utility before." To the extent a standard of competence is thereby fixed it is deleted. Lack of competence in the performance of municipal duties can only be cured at the ballot box. The manner of operation, until more appears, is in the discretion of the council. George v. City of Asheville, N. C., 80 F.2d 50, 54, 103 A. L. R. 568; and Indiana Service Corporation v. Town of Warren, 206 Ind. 384, 189 N.E. 523, 526, 527.

X. It follows the decree of the trial court is reversed insofar as it orders or requires the following:

(1) An election on the electors' petition filed August 15, 1962, to extend the lease.

(2) Compliance with sections 397.38 or 397.39 to transfer funds.

(3) Requires an election for authority to exercise the option.

(4) Requires an election for authority to operate the plant.

The rights and duties of defendant city and defendant Northern Natural Gas Company are hereby declared as follows:

(1) The city's transfer of funds is proper and its tender to the Northern Natural Gas Company is good, except the proper amount may be determined by agreement, arbitration or supplemental decree.

(2) Northern Natural Gas Company has the present duty to deliver title to the distinguishable extensions, improvements and additions to the city as of August 15, 1962, upon receipt of the purchase price determined as above set out.

(3) Northern Natural Gas Company has the present duty to continue in possession of, and operate the entire system, both the original part and the extensions, improvements and additions, and maintain service to all customers and persons entitled to service until such time as other service is provided.

(4) If the purchase of the extensions, improvements and additions is completed, Northern Natural Gas Company has the duty to pay and the city is entitled to receive the fair rental

1118

value, to be determined by supplemental decree if the parties do not agree thereon, for the period of time the system is in the possession of and operated by Northern Natural Gas Company commencing with August 15, 1962, insofar as the distinguishable extensions, improvements and additions are concerned, and from the period for which the last voluntary acceptance of rent was made by the city for the original part of the system. And further, if the purchase is completed, and during the time Northern Natural Gas Company is in possession and operating the system it becomes necessary to make further extensions, improvements and additions to give service to new and additional customers, Northern Natural Gas Company shall construct and make such and the city shall pay Northern Natural Gas Company the fair and reasonable cost thereof upon completion of the work.

(5) In the event the city determines to operate the system by purchasing gas it must first obtain authorization to purchase gas by an election as contemplated in section 397.5, Code of Iowa, 1962. In this event the city and Northern Natural Gas Company are ordered to join in an agreement for a supply of gas and to seek in good faith the approval of the Federal Power Commission if required. In such event it is the duty of Northern Natural Gas Company as the pipeline supplier to continue to furnish gas for the system. Upon the city obtaining authorization from the electors and obtaining a supply of gas, Northern Natural is then ordered to deliver possession of the entire system to the city. The city has no right to possession of the system until it obtains a supply of gas to operate the system.

The decree is affirmed in part, reversed in part, modified and remanded for a decree in conformity with this opinion.

Costs are taxed one fourth to the city and three fourths to Northern Natural Gas Company.—Affirmed in part, reversed in part, modified and remanded with directions.

All JUSTICES concur except HAYS, J., not sitting.