# Staunton

## CATHERINE D. RUNNELS, AN INFANT, ETC., ET AL. v. STAUNTON REDEVELOPMENT AND HOUSING AUTHORITY, ET AL.

September 9, 1966.

Record No. 6175.

Present, All the Justices.

*J. Sloan Kuykendall* (*J. Forester Taylor*; *Kuykendall and Whiting*, on brief), for the appellants.

*Richard W. Smith* and *George M. Cochran* for the appellees.

GORDON, J., delivered the opinion of the court.

This is a contest between the Staunton Redevelopment and Housing Authority and the owners of properties the Authority wishes to condemn.

The Authority proposes to carry out its Plan for the redevelopment of a two and a half block area near the central business district of Staunton.[1] The present use of the buildings in the area ranges from commercial or industrial to residential, with commercial uses in the majority. The Authority intends to redevelop the land for commercial uses.

To carry out the Plan the Authority must acquire all properties within the area by purchase or condemnation. And it can legally acquire these properties only if the Authority's finding that the area is "blighted or deteriorated" can stand. See the Virginia Housing Authorities Law, Va. Code Ann. Title 36, Chapter 1 (Repl. vol. 1953), as amended, particularly Va. Code Ann. § 36-49(1) (Supp. 1966).

Catherine D. Runnels and the other appellants, who own properties within the area, are unwilling to sell their properties to the Authority. To prevent condemnation they brought this suit against the Authority for a declaratory judgment, asking the court to declare (among other matters) that the area was not blighted or deteriorated.[2] The trial court denied all of the complainants' prayers

---

(1) The plan, which has been adopted by the Authority and approved by the Council of the City of Staunton, is designated the "Central Avenue Urban Renewal Plan". We will refer to it as the "Plan" or "redevelopment Plan".

(2) Certain of the appellant-property owners intervened as complainants after the suit was instituted. The City of Staunton intervened as a party defendant in support of the Authority's position.

and dismissed their bill of complaint. We must decide whether the court erred.

The trial judge ruled that the property owners had the burden of proving the area was not blighted or deteriorated within the meaning of Code § 36-49.[3] He described this burden as "heavy", because "the exercise of municipal power in this case is clothed with a presumption of validity". He ruled that the property owners had failed to bear their burden because the evidence did not show the Authority's finding of blight was arbitrary or unwarranted.

The property owners attack these rulings. They contend the burden of proof should have been placed upon the Authority and, even if the burden were properly placed upon them, they should have been required to prove absence of blight "by [only] the ordinary preponderance of the evidence".

The trial judge based his ruling upon our opinion in *Bristol Housing Authority* v. *Denton*, 198 Va. 171, 93 S.E.2d 288 (1956), and the authorities relied on in that opinion. So in determining whether the trial judge in this case was correct in his rulings respecting the burden of proof, we will begin with an examination of our opinion in the *Denton* case.

In *Bristol Housing Authority* v. *Denton, supra,* the property owners brought suit to enjoin the Bristol Redevelopment and Housing Authority from proceeding with a redevelopment project and from acquiring their lands by purchase or condemnation. The trial court held: "(1) Whether the city council[4] had exceeded its authority in determining that the area was a slum, blighted, or deteriorated area and available for redevelopment under the terms of the statute was subject to judicial review; (2) 'The overwhelming weight of evidence' showed that the area was not in fact a slum, blighted, or deteriorated area; and (3) The evidence showed that the 'primary purpose' of the proposed redevelopment was for 'com-

(3) Code § 36-49 defines blighted or deteriorated areas as: "areas (including slum areas) with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement of design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals or welfare of the community". Va. Code Ann. § 36-49(1) (Supp. 1966).

(4) As noted by this Court, "the primary responsibility of investigating the conditions in an area proposed for redevelopment, and determining whether it is a slum, blighted or deteriorated area, is delegated to the local redevelopment authority and not to the city council." *Bristol Housing Authority* v. *Denton*, 198 Va. at 176, 93 S.E.2d at 292.

mercial' uses and not the clearance of slum, blighted, or deteriorated areas." *Id.* at 174, 93 S.E.2d at 291. The trial court enjoined the Authority from proceeding with the project, and we affirmed.

Because the power of a housing authority to acquire property in a proposed redevelopment area depends upon the condition of the area, we agreed in the *Denton* case that the trial court had "the right to determine whether the area . . . [was] in fact 'blighted or deteriorated' as defined in the statute. Code § 36-49(1)." *Id.* at 178, 93 S.E.2d at 293. But we pointed out that the right to judicial review is subject to well-recognized limitations.

". . . [W]hether a particular ordinance enacted pursuant to a general grant of power is arbitrary and unreasonable and therefore void is a question for the court." *Id.* at 177, 93 S.E.2d at 293. But "[a]ll presumptions are in favor of the validity of the exercise of municipal power", and "[t]he burden is upon one alleging the invalidity of an ordinance to establish such invalidity by clear and convincing proof". *Id.* "The same principles apply to the findings of fact by a redevelopment authority to which . . . the General Assembly has delegated the primary responsibility of determining the conditions in an area and initiating the project." *Id.*

We pointed in the *Denton* opinion to previous declarations by this Court that legislative findings will not be disturbed unless they are arbitrary and unreasonable.[5] Other authorities cited in *Denton* are to the same effect.[6]

Nevertheless, we agreed that the evidence before the trial court in the *Denton* case warranted its finding that " 'to characterize this as a slum or blighted area is to go contra to the overwhelming weight of the evidence in the case.' " *Id.* at 180, 93 S.E.2d at 295. We held: "Since the evidence clearly shows that the area as a whole does not meet . . . [the] statutory definition [in Code § 36-49(1)], it necessarily follows that the action of the local Authority in finding that because of this condition the property should be acquired for redevelopment purposes, and the action of the council in approving the project, *were devoid of legal authority, arbitrary and unwarranted.* Consequently, the appellees [property owners] were en-

---

(5) *Nat. Linen Service* v. *Norfolk*, 196 Va. 277, 279, 83 S.E. 2d 401, 403 (1954); *Mumpower* v. *Housing Authority*, 176 Va. 426, 443, 11 S.E.2d 732, 738 (1940); *Reynolds* v. *Milk Commission*, 163 Va. 957, 967, 179 S.E. 507, 510 (1935).

(6) E.g., *Chapman* v. *Housing Authority*, 121 W. Va. 319, 3 S.E.2d 502 (1939); 2 McQuillan, Municipal Corporations §§ 10.33, 10.37 (3rd ed. 1949).

titled to the relief prayed for in their bill." [Emphasis supplied] *Id.* at 181-182, 93 S.E.2d at 296.

The trial judge's ruling in the present case was consistent with our opinion in the *Denton* case. The property owners asked him to invalidate the Staunton Authority's finding of blight and the City Council's approval of the Authority's redevelopment Plan. They had the burden under *Denton* of establishing the invalidity of these actions.

■ Furthermore, the trial judge correctly assessed the measure of proof required of the property owners to sustain their burden. In the *Denton* case we reaffirmed the principle that "legislative conclusions based on findings of fact are not immune from judicial review where they are arbitrary and unwarranted". *Id.* at 176-177, 93 S.E.2d at 292. The trial court therefore had jurisdiction in this case to review the Staunton Authority's finding that the area was blighted. But it was incumbent upon the property owners to show by competent evidence that the Authority's finding of blight was arbitrary and unwarranted. The trial judge correctly ruled that the property owners' burden could not be sustained by the "ordinary preponderance of the evidence".

■ The property owners do not concede defeat even if, as we have held, the trial judge ruled correctly concerning the burden of proof. They contend the evidence proved conclusively that the project area was not blighted. However, the trial judge found that the property owners not only had failed to prove the Authority's determination of blight was arbitrary and unwarranted, but failed even to rebut the affirmative evidence of blight brought forth by the Authority. The trial judge said in his opinion:

> "Though the complainants [property owners] have had expert witnesses examine every building and these apparently well qualified experts have testified that the majority of the buildings are structurally sound, complainants' witnesses have not successfully rebutted defendants' [Authority's] well qualified experts who made careful and minute examinations of each building, room by room, and testified convincingly that the buildings are blighted within the meaning of Sec: 36-48 and 36-49 of the Code." [7]

---

(7) Code § 36-48 sets forth the finding and declaration of the General Assembly as to blighted areas within the Commonwealth. It states in part:

"(a) that there exist in many communities within this Commonwealth blighted

After issue was joined and before the taking of evidence, the trial judge made an examination of the project area. He viewed "the exterior of all the buildings therein and the interior of practically every room of each building". The judge heard all the property owners' evidence in chief and part of the Authority's evidence in chief. The Authority's remaining evidence in chief and the property owners' rebuttal evidence were submitted by depositions. The evidence consumes 1,475 pages of the printed record. We deem it necessary to point out only the most significant evidence brought forth by the Authority.

The Authority called, among other expert witnesses, an architect and an engineer. They had made independent and detailed inspections of the building in the project area. Each was familiar with the definition of blight contained in Code § 36-49 (see footnote 3) and the requirements of the building and safety codes adopted by the City of Staunton.[8] These experts testified at length (293 pages of the printed record) about the condition of each building in the area. They concluded that 22 of the 32 buildings in the area were dilapidated. Other buildings, though not classified as dilapidated, had inadequate lighting, ventilation and sanitary facilities or other defects. More than 200 photographs introduced in evidence supported their conclusions. Many other witnesses, lay and expert, agreed that the area as a whole was deteriorated and in a "run-down" condition.

The Authority introduced evidence relating also to the question whether the dilapidated or "run-down" condition of the area was "detrimental to the safety, health, morals or welfare of the community" within the meaning of Code § 36-49 (see footnote 3). The evidence indicated that the condition of the area was detri-

---

areas (as herein defined) which impair economic values and tax revenues, cause an increase in and spread of disease and crime, and constitute a menace to the health, safety, morals and welfare of the residents of the Commonwealth; (b) that the clearance, replanning, rehabilitation and reconstruction of such blighted areas and the sale or lease of land within such areas for redevelopment in accordance with locally approved redevelopment plans are necessary for the public welfare and are public uses and public purposes for which public money may be spent and private property acquired by purchase or the power of eminent domain, and are governmental functions of grave concern to the Commonwealth;" Va. Code Ann. § 36-48 (Repl. vol. 1953).

See footnote 3 for the provisions of Code § 36-49 defining blighted or deteriorated areas.

(8) National Electrical Code, National Fire Prevention Code, National Building Code and Minimum Standard Housing Code.

mental to the "safety" of the community, but the most persuasive detriment shown by the Authority's evidence was detriment to the "welfare" of the community. A dilapidated area adjacent to the central business district of Staunton is inherently detrimental to the economic welfare of the community. Furthermore, detriment is evidenced by the decline in the number of licensed businesses in the area (31 to 17), in business receipts (approximately $1,250,000 to $870,000) and in real estate tax revenues (13%) during the period 1951-1962.

This evidence supported the trial court's holding that the Authority's finding of blight was not arbitrary or unwarranted. The court therefore committed no error in dismissing the property owners' bill of complaint.

Two collateral issues remain. In their bill for a declaratory judgment, the property owners asked the court to declare the Virginia Housing Authorities Law unconstitutional or, in the alternative, to declare the Staunton redevelopment Plan invalid. They now assign error to his refusal of each prayer. The property owners contend that the Virginia Housing Authorities Law is unconstitutional because it fails to set forth an adequate standard for determining whether a given area is blighted or deteriorated. The standard is set forth in Code § 36-49, for which see footnote 3, *ante*.

The property owners argue that this standard is constitutionally inadequate, because the meaning of each descriptive word contained in the definition is uncertain. They say reasonable men can differ about the meaning of the word "dilapidation" and of each other descriptive word set forth in Code § 36-49. Therefore, they argue, the section provides no adequate standard for determining whether an area is blighted or deteriorated and, consequently, no standard for determining whether property is to be taken for a public use. From this hypothesis, the property owners conclude that the Virginia Housing Authorities Law (of which Code § 36-49 is a part) violates Section 58 of the Constitution of Virginia and that the Authority's taking of their properties would violate the due process clause of Section 11 of the Constitution of Virginia.

We have held the Virginia Housing Authorities Law constitutional. *Hunter* v. *Norfolk Redevelopment Authority*, 195 Va. 326, 78 S.E.2d 893 (1953). The property owners in *Hunter* raised the same constitutional question that has been raised in this case; they devoted a section of their brief to the argument that the standard

set forth in Code § 36-49 is abstract, vague and insufficient and, therefore, arbitrary and unreasonable. By our holding in *Hunter*, we rejected this argument. Moreover the adequacy of a standard like that set forth in Code § 36-49 is amply supported by authorities in other jurisdictions.[9]

Lastly, the property owners contend that the Plan as approved by the Staunton City Council does not comply with the requirements of Code § 36-51. That section provides than an authority shall not initiate a redevelopment project

> "until the governing body [of the city or county] . . . has approved a plan . . . which provides an outline for the development or redevelopment of the area and is sufficiently complete (1) to indicate its relationship to definite local objectives as to appropriate land uses and improved traffic, public transportation, public utilities, recreational and community facilities and other public improvements; (2) to indicate proposed land uses and building requirements in the area; (3) to indicate the land in the area to be made available to private enterprise for redevelopment and that land which is to be made available to public enterprise for redevelopment; and (4) to indicate the method for the temporary relocation of persons living in such areas; and also the method for providing (unless already available) decent, safe and sanitary dwellings in the locality substantially equal in number to the number of substandard dwellings to be cleared from the area, at rents within the financial reach of the income groups displaced from such substandard dwellings." Va. Code Ann. § 36-51 (Repl. vol. 1953).

Code § 36-51 requires, then, that a redevelopment plan contain an outline for the redevelopment of the project area and that the plan be sufficiently complete to "indicate" certain things described in clauses (1) through (4) of that section. With these requirements in mind, we will set forth the salient provisions of the Plan.

The Plan summarizes the local objectives: "(a) the provision of

---

(9) *City of Chicago* v. *R. Zwick Co.*, 27 Ill. 2d 128, 188 N.E. 2d 489 (1963); *Urban Renewal Agcy.* v. *Iacometti*, 79 Nev. 113, 379 P.2d 466 (1963); *Wilson* v. *Long Branch*, 27 N.J. 360, 142 A.2d 837 (1958) (involving language identical with Va. Code § 36-49); *Alanel Corp.* v. *Indianapolis Redevelopment Comm.*, 239 Ind. 35, 154 N.E.2d 515 (1958); *Randolph* v. *Wilmington Housing Authority*, 37 Del. Ch. 202, 139 A.2d 476 (1958); *Gohld Realty Co.* v. *Hartford*, 141 Conn. 135, 104 A. 2d 365 (1954); *Velishka* v. *Nashua*, 99 N.H. 161, 106 A.2d 571 (1954); and *Herzinger* v. *City of Baltimore*, 203 Md. 49, 98 A.2d 87 (1953).

space for the expansion of the existing business area; (b) the construction and widening of Augusta Street as a leg of the downtown inner loop street system needed to improve access to and around the downtown area; (c) the provision of off-street parking space; (d) the elimination and redevelopment of a blighted area."

Under the Plan the Authority will acquire all property within the area and remove all existing structures. The Authority will dedicate part of the land for the widening of Augusta Street, as well as Frederick Street and Central Avenue, which also abut the project area. It will reserve an easement for new sewer lines. The balance of the area will be developed for commercial purposes.

The plan describes the uses to which the redeveloped area will be devoted: banks, business and professional offices, retail stores and shops, personal service businesses, bakeries, repair services or businesses, and automobile parking lots and parking garages. It sets forth regulations concerning building height, setback, land coverage, off-street parking spaces, off-street loading spaces, and landscaping in the redeveloped area.

The Plan recites: "A survey of site occupants of the Project Area . . . indicated . . . thirty dwelling units, being occupied by sixteen white tenant families, one non-white homeowner, eight single-person white tenants, five transient roomers. An analysis of their needs and a study of the housing supply in Staunton indicates there are ample, decent, safe, and sanitary housing units available in the locality, at rents within reach of the income groups to be displaced." The Plan provides for a relocation office and supervisory personnel to assist in the relocation of persons now living in the project area. It provides that "[n]o family will be required to move from a home in the Project Area unless the family has an opportunity to obtain suitable standard housing."

In our opinion, the Plan complies with the requirements of Code § 36-51. We deem it necessary to discuss only one argument advanced by the property owners against this conclusion.

The property owners argue that the Plan does not satisfy the requirements of clause (1) of Code § 36-51 because "[t]here is no attempt [in the Plan] to tie in public transportation, public utilities, recreational and community facilities and other public improvements". They contend a redevelopment plan "must indicate its relationship to all . . . community interests" listed in clause (1), that is, the Plan must indicate its relationship to definite local objectives

respecting "appropriate land uses and improved traffic, public transportation, public utilities, recreational and community facilities and other public improvements" (see clause (1) of Code § 36-51, quoted *ante*).

Clause (1) of Code § 36-51 does not require, however, that a redevelopment plan relate to all the community interests listed in that clause. It requires that a plan indicate any relationship it may have to the enumerated community interests. By failing to refer to recreational facilities and certain other community interests enumerated in clause (1), the Plan indicates that it has no relationship to such community interests. Indeed, one would not reasonably expect that a plan directed to the redevelopment of an area for commercial uses would have relation to all the community interests listed in clause (1). For example, one would not reasonably expect that such a plan would provide for recreational facilities within the redeveloped area or have any relationship to existing recreational facilities outside the area.

The Plan does indicate its relationship to definite local objectives respecting appropriate land uses, improved traffic facilities and other community interests. We hold that the Plan complies with the requirements of clause (1), as well as the other provisions of Code § 36-51.

*Affirmed.*