GREGORY M. LYONS, *ET UX, ET AL.*, PLAINTIFFS-APPEL-LANTS, v. CITY OF CAMDEN, A MUNICIPAL CORPORA-TION, THE HOUSING AUTHORITY OF THE CITY OF CAMDEN, CAMDEN CITY PLANNING BOARD, BOTH BODY CORPORATE, POLITIC AND A MUNICIPAL AGENCY, DEFENDANTS-RESPONDENTS.

Argued February 6, 1968—Decided June 6, 1968.

Mr. *Carlton W. Rowand* argued the cause for appellants.

*Mr. William N. Rosenblatt* argued the cause for respondents (*Mr. Joseph M. Nardi, Jr.,* attorney for City of Camden; *Mr. Martin F. McKernan,* attorney for The Housing Authority of the City of Camden; *Mr. Dominic G. Bocco,* attorney for Camden City Planning Board).

The opinion of the court was delivered by

FRANCIS, J. After investigation and public hearing, the Planning Board of the City of Camden on December 30, 1965 declared blighted a section of the City known as the Northshore area. *N. J. S. A.* 40:55–21.1 *et seq; N. J. S. A.* 55:14A–31 *et seq.* On February 10, 1966 the City Council, after reviewing the matter, approved the Board's finding and adopted a resolution setting forth its determination that the entire area was blighted. Plaintiffs are a substantial number of home owners who live in one section of the Northshore area. They attack the validity of the blight declaration as far as it includes their section within its scope. When the matter was first before the trial court the action of the local agencies was sustained. We certified the subsequent appeal to the Appellate Division, and after argument in this Court remanded the matter to the trial court for further consideration. 48 *N. J.* 524 (1967). That was done because our examination of the record indicated that the plaintiffs had not been accorded an adequate opportunity to cross-examine the municipal witnesses and to introduce proof of their own to negative the finding of blight as it related to their locale. Thereafter, a full hearing was conducted in the Law Division. At the conclusion thereof, the trial judge reaffirmed the blight determination and filed an exhaustive opinion setting forth his supporting reasons. On plaintiffs' application we certified the matter directly from the trial court.

As we have indicated, the part of the City involved is called the Northshore area. It consists of 272.45 acres and based upon the proof has "sound" boundaries in accordance with recognized municipal planning criteria. It is bounded

on the west by the New Jersey Channel of the Delaware River; on the north by 36th Street, the boundary line between Camden and Pennsauken; on the east by a proposed 155-foot wide right-of-way, a reconstruction of Harrison Street running from State Street to 36th Street; on the south by State Street and Cooper River. Much of the soil in the area contains river mud and marsh which present foundation design difficulties. A sewage treatment and disposal plant is located north of 27th Street. It was estimated that there are approximately 100 abandoned barges along the shoreline of the area declared blighted.

Most of the area, 210.67 acres of the 272.45 acres involved or 77.3%, consists of undeveloped land; 23.66 acres are streets and rights-of-way, many of the streets being paper streets. Seventy-four per cent of the vacant land is owned by the City of Camden; 47 acres of this are under water between the shoreline and the United States Pierhead and Bulkhead line; 85 acres are used for a city dump. Developed land is generally concentrated in two locations. One is between 27th and 30th Streets; the other extends from Beideman Avenue to 36th Street. Residential land occupies 11.61 acres, commercial, 11.07 acres, industrial, 8.28 acres, and land in public use, 7.16 acres. There are 198 structures in the entire area, of which 168 are dwellings. Eighty-nine or 53% of the dwellings were described as substandard by the Planning Board's experts; 33 others were said to have significant deficiencies. Approximately 4.3% of the total area is devoted to residential use. About 6.76 acres or 58% of the 11.61 residential-use acres are occupied by the substandard houses. Fourteen of the residential structures are unoccupied and in such state of disrepair as to be untenantable. Twenty-three residential structures are not connected to the City sanitation system. Many of the residences are 40 years old or more. Many of the residence lots are very small, with little or no front or side yards. The entire area was said to be subject to fires, 255 fire calls having been made from 1961 through 1965. The streets servicing the

residential area were described as inadequate, particularly the one collector street.

Of the 30 non-residential buildings, 14 were intended for industrial and manufacturing use; three of these 14 are vacant and dilapidated and considered untenantable. Six of the remaining 16 contain critical deficiencies and are classed as substandard.

The plan envisioned for the entire 272.45 acre tract was development of an integrated community within Camden's Northshore. It would include housing, a community center, a school or schools, churches and recreational areas. There was expert testimony showing that use of the entire acreage was necessary to bring the plans to fruition.

As has been indicated above, the residential portion of the area declared blighted is almost entirely between 27th and 36th Streets. Its north-south boundaries are between the northerly side of 27th Street and the northerly side of 36th Street (the northerly boundary of the entire tract found blighted); the east-west boundaries are between Harrison Avenue (the 155 foot right-of-way) and the Delaware River channel. All of the plaintiffs' homes are within this area. For purposes of presenting their claim, plaintiffs have divided the blighted territory into two parts. The portion just described, where their homes are located, is referred to as the "smaller area"; the remainder of the Northshore area is called the "larger area." The dividing line between the two is 27th Street.

Plaintiffs make no attack of any consequence on the declaration of blight so far as it relates to the larger area, south of 27th Street. They claim, however, that the smaller area containing their homes is not blighted and can be conveniently excluded from the total acreage by using 27th Street as a natural boundary. Therefore, they contend the determination of blight, to the extent that it includes the smaller area, is arbitrary, unreasonable and not supported by substantial evidence as required by the statute. *N. J. S. A.*

40:55–21.6. After thorough consideration of the matter on remand the trial court rejected the contention.

Defendants' expert testimony was to the effect that the gross Northshore area of 272.45 acres is blighted within the meaning of our statute, *N. J. S. A.* 40:55–21.1. The area has natural boundaries, as set forth above, and if a successful urban renewal program is to be undertaken sound principles of planning require use of all of the land within those boundaries. Moreover, the municipality's principal expert witness asserted that the condition of the smaller area was such that, even if it stood alone, it would be deemed blighted.

The smaller area encompasses 129 acres, of which 11.61 acres or 9% are devoted to residential use. (This constitutes 4.3% of the gross Northshore area.) Sixty-nine and one-half (69½ acres or 54% are vacant land, about 50% of which is owned by the City; 13 acres or 10% consist of paper or paved streets. The 11.61-acre residential portion has paved streets which provide access to the rest of the City. Except for that section there are no paved roads within the undeveloped area. Twenty and six-tenths (20.6) acres or 16% are under water between the shoreline and the bulkhead line. About 50 sunken barges dot the waterline of this smaller area. It may be noted also that Adams Avenue between 28th and 30th Streets has no sewer facilities. The remaining acreage is devoted to public (such as a sewage disposal plant), commercial and industrial purposes.

In the ten-year period 1955 to 1965 a total of 59 permits were issued for residential improvements. Only one was for a new home, having a reported cost of $10,000. The remaining 58 permits, for a total of $31,000, were issued for repairs and alterations of residences. In the same period permits for work totaling $38,000 on non-residential structures were issued. One of the property owners who had lived in the neighborhood for 54 years testified that his home was over 50 years old, and that there had been no improvements and no construction of any kind in the smaller area for the last 20 years. Another owner conceded that 40%

of the homes in this area are from 40 to 50 years old; a third said 40% were from 25 to 40 years of age.

There are 164 dwellings in the smaller area. Defendants' experts found 85 of them to be substandard, *i. e.* containing a combination of critical and intermediate deficiencies or numerous and varied intermediate deficiencies. In the gross Northshore area, of the 168 residential structures, 144 one-family, 8 two-family and two one-family plus commercial use are occupied; 14 of them are vacant and not suitable for occupancy.

An experienced firm of planning and urban renewal consultants made a thorough study of the area for defendants. A structure-by-structure survey was made by four of the firm's assistants, three of whom were engineers and the fourth a registered architect. Their conclusions were reached after exterior and interior investigations of the dwellings. If exterior examination disclosed a substandard condition, there was no need for interior inspection. But, in any event, interior inspections were made in 68% of the dwellings. The ultimate determination of a substandard condition followed application of extensive testing criteria established by the consultants to the critical or intermediate deficiencies found in each dwelling. The results of every individual investigation were noted on a survey sheet. Our own examination of the record leads us to agree with the trial court that defendants' experts' survey and study of both the larger and smaller areas were skilled and thorough. Moreover, the trial court in company with counsel for the parties made a physical inspection of the Northshore area, with emphasis on the smaller area. Observations made during this visit enabled the court to have a thorough understanding and appreciation of the maps and testimony.

Plaintiffs introduced in evidence by consent photographs of 37 dwellings located in the smaller area; 35 of the dwellings are between 27th and 30th Streets, the other two are between 32nd and 36th Streets. It was stipulated that defendants' experts did not find them to be blighted. Plaintiffs also pro-

duced 12 property owners, 10 of whom reside in the section between 27th and 30th Streets; the other two live in the section · between Beideman Avenue and 36th Street. They asserted, contrary to defendants' experts' report, that their homes were not substandard and they produced photographs of them. A number of the photographs were not very clear and consequently were not particularly helpful. Some of these persons conceded exterior deficiencies. Others admitted not having inspected the deficiencies reported in their homes, but felt the condition was good because they were occupying them. Generally the homeowner-witnesses spoke in terms of their own homes and not in terms of the overall physical condition of the smaller area.

Plaintiffs produced a witness who qualified as a planning expert. He expressed the view that using 27th Street as the demarcation line, the smaller area could be excluded from the total area declared blighted. The trial court found, and we agree, that the witness made a most superficial inspection of the area. He thought he looked at all the homes, but he did not make or keep notes on each house; nor did he ever make a field-survey sheet showing the results of his alleged physical inspection. It was obvious· that the opinion he expressed was based upon the homeowners' testimony and the photographs of the exteriors and of some of the interiors of the dwellings. He concluded that 47% and not 53% (as asserted by defendants' experts) of the homes were substandard. That percentage was reached by subtracting the 12 homes described by the owner-witnesses as not being substandard from the 85 which were declared by defendants' experts to be substandard. Clearly the basis upon which his deduction was made was insubstantial.

The trial court declared that plaintiffs' expert's testimony was "evasive, contradictory and inherently improbable," and in several instances not based on facts or personal knowledge. The court said also that if any survey at all was made, it consisted of a superficial glance at the exteriors of the dwellings and no entry to inspect the interiors; and finally that

the testimony was unworthy of credence. Our own reading leads us to agree thoroughly with the trial court's appraisal of the witness's testimony.

█ █ There is no doubt that the smaller area north of 27th Street contains some homes that are sound. Such fact, however, is not sufficient to evoke a judicial pronouncement that defendants' determination of blight of the gross North-shore area was an abuse of discretion. As we said in the earlier opinion in this case, "[d]enial of the right of the municipality to draw into a blighted area certain houses or buildings which are in good condition might well serve to defeat the over-all legislative purpose, namely, the redevelopment of blighted *areas.*" 48 *N. J.*, at *p.* 536. The statutory authorization is to attack the problem of blight on an area rather than a structure-by-structure basis. See *N. J. S. A.* 40:55–21.1.

Defendants offered persuasive testimony that conditions of the Northshore area warranted a declaration of blight for the entire area, and that accepted planning principles required it to be looked at as an entity. The experts said it was surrounded by sound boundaries for unit development. Particular reference was made to the 155-foot-wide North-shore Highway or Parkway marking the easterly line, this being part of an already existing plan for municipal development. Large areas of vacant land exist throughout the tract. There are incompatible industrial uses and unclean shore-lines in both the so-called larger and smaller sections. In short, the witnesses said that the nature of the area and its boundaries were such that the various blight factors are interrelated and could only be eliminated by utilization of a comprehensive redevelopment program. Obviously, in view of the substantially common problems presented throughout Northshore, they felt that a piecemeal approach would be merely palliative and not curative; that the whole area needed redesigning to produce a coordinated and multifaceted plan for community improvement.

■ Decision as to whether an area is blighted and as to the boundaries of a particular redevelopment project area is committed by the Legislature to the discretion of the described local governmental agencies. *N. J. S. A.* 40 :55–21.2, –21.6. Clearly the extent to which the various elements that informed persons say enter into the blight decision-making process are present in any particular area is largely a matter of practical judgment, common sense and sound discretion. It must be recognized that at times men of training and experience may honestly differ as to whether the elements are sufficiently present in a certain district to warrant a determination that the area is blighted. In such cases courts realize that the Legislature has conferred on the local authorities the power to make the determination. If their decision is supported by substantial evidence, the fact that the question is debatable does not justify substitution of the judicial judgment for that of the local legislators. As the United States Supreme Court said in *Berman v. Parker,* 348 *U. S.* 26, 35–36, 75 *S. Ct.* 98, 104, 99 *L. Ed.* 27, 39 (1954) :

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."

After studying the record presented to us, we are convinced, as was the trial court, that substantial evidence supports the municipal determination that the entire Northshore area, as described, should be declared blighted and treated as an integral unit for urban renewal purposes. Consequently the determination must be affirmed. *Wilson v. City of Long Branch,* 27 *N. J.* 360, 379 (1958).

In connection with our affirmance we repeat the comment in *Wilson v. City of Long Branch* :

"It is understandable that individual property owners, who believe their homes to be in good condition and fully adapted to purposes

of residence, find it difficult to accept a determination of blight. Obviously, the prospect of dislocation adds to the difficulty. However, the process contemplated by the law cannot be accomplished by means of individual selection of property. It must proceed in terms of redevelopment of areas. Such improvements will inevitably envelop some property or properties which, standing alone, cannot be so described. When this occurs, the individual must bow to the public welfare and accept just compensation for his deprivation." 27 *N. J.*, at *p.* 395.

There can be no doubt that a declaration of blight ordinarily adversely affects the market value of property involved. This is unfortunate because in so many instances the physical taking of the property does not occur for a number of years. In the meantime the owner can only wait for that ultimate taking; there is usually no reasonable market otherwise open to him for sale of the property. Moreover, in the interim his good housekeeping incentive generally recedes and deterioration of the building sets in. The Legislature has recognized the difficulty and has partially rectified it by providing that when property previously declared blighted is condemned the value "shall be fixed and determined to be no less than the value as of the date of the declaration of blight * * *." *L.* 1967, *c.* 217, § 1; *N. J. S. A.* 40:55–21.10.

In fairness, it is not enough to assure the property owner that at some time, perhaps years hence, he will receive the market value of his property as of the date of the declaration of blight. Meanwhile, he and his family may well be imprisoned economically in the blighted area because he needs the capital invested in the blighted-area dwelling in order to purchase a new home elsewhere. Consequently, he must endure the deterioration that afflicts a neighborhood at an accelerated pace following a declaration of blight. In this contest, equitable considerations call for action by the public authority to effectuate the redevelopment plan with reasonable dispatch, at least to the extent of the financing necessary to acquire the land to be redeveloped.

Section 9 of the blighted area statute authorizes an objector, as defined therein, to obtain a judicial review of

the determination of blight. The section concludes by saying that in such action the reviewing court "may make any incidental order that shall be deemed by the court to be proper." *N. J. S. A.* 40:55–21.9. In our judgment that broad language sanctions such judicial action in aid of the affected property owners as their legitimate interests require. Accordingly, although the declaration of blight is affirmed, we direct that the defendants proceed with reasonable dispatch to bring the proceedings contemplated by the statute to completion. See *N. J. S. A.* 40:55–21.10. If this is not done within such time as is reasonable under the circumstances, plaintiffs may apply to the Superior Court, Law Division, for such relief as the demands of justice may require.

Subject to the foregoing qualification, we find no merit in the grounds of appeal presented by plaintiffs. The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.