Robert D. DILLEY, Plaintiff-Appellant,

v.

The CITY OF DES MOINES, Iowa, et al., Defendants-Appellees,

Thomas C. Fredregill, Intervenor-Appellee.

No. 2–59152.

Supreme Court of Iowa.

Nov. 17, 1976.

Joseph Z. Marks and Kenneth D. Benhart, Des Moines, for plaintiff-appellant.

M. A. Iverson, City Solicitor, and Philip T. Riley, Corporation Counsel, Des Moines, for defendants-appellees.

John A. McClintock and Harry W. Haskins, of Hansen, Wheatcraft & McClintock, Des Moines, for intervenor-appellee.

REYNOLDSON, Justice.

This appeal, which we advanced out of its ordinary submission order, raises issues relating to the Des Moines Capitol Center Development Urban Renewal Plan.

Plaintiff Robert D. Dilley brought an equity action in Polk county district court against the city, its mayor and council members for judgment declaring the renewal plan illegal, for temporary injunction

enjoining defendants from further implementing the plan, for accounting of funds alleged to have been unlawfully expended on the project, and for judgment for the city and against the individual defendants for the amount of funds found to be illegally spent. Thomas S. Fredregill intervened, alleging an interest in the case as a potential redeveloper of a portion of the area. Following a seven and one-half day trial, judgment was entered January 13, 1976 dismissing the petition. Upon plaintiff's appeal, we affirm.

In 1973 the City of Des Moines had under consideration an urban renewal plan which included portions of the business district on both sides of the Des Moines River. June 18, 1973, Barton-Aschman Associates, Inc., a Chicago consulting firm, was retained to make a feasibility study and report.

This study encompassed a rectangular area comprising 67 blocks, approximately four blocks wide, which included the heart of the business district on the west and extended to the capitol grounds on the east. Barton-Aschman obtained relevant information from the plan and zoning department, city engineer, engineering bureau, traffic and transportation department, building department, and department of urban development. The study involved an exterior survey of all structures in the area and an interior-exterior inspection of 50 selected buildings.

This study was detailed in a subsequent written report which identified this area as slum or blighted under provisions of Chapter 403, The Code. The firm found 67 percent of the structures in the area to be deficient and 27 percent of the buildings either to be structurally substandard to a degree warranting clearance, or requiring clearance in order to effectively remove blighting influences. In addition, the study disclosed the area was characterized by environmental deficiencies, including storm sewer needs, incompatible uses and structures, congested streets, functionally and economically obsolete buildings, and small tracts in diverse ownership impeding sound private growth.

In conformance with the study Barton-Aschman fashioned a written urban renewal plan for the area, including an introduction, legal description of the area, objectives, land-use provisions, planning criteria, project proposals including acquisition, rehabilitation and conservation, underground utilities, redevelopers' requirements, land disposition supplements and a procedure for changes in the approved plan.

Following statutory procedures, the above plan was submitted to the Des Moines planning commission to insure that it conformed to the 1964 general plan for development of the municipality. It was presented to and approved by the urban renewal board which recommended it to the city council for approval.

July 23, 1973 the council adopted a resolution finding the 67-block urban renewal area to be a slum and blighted area in need of rehabilitation within the meaning of § 403.4 and § 403.17(8) and (9), The Code, 1973.

August 2, 1973, following hearing pursuant to published notice, the city council adopted the urban renewal plan by a unanimous roll call vote. The council intended to fund the project with $22,000,000 in general obligation bonds supported by tax increment financing pursuant to § 403.19, The Code.

August 13, 1973 the council passed the necessary § 403.19 ordinance to fix the valuation base of all property in the area as a prelude to using tax increment financing.

The proposal to issue the above bonds was approved by only 53 percent (instead of the required 60 percent) of those voting at a September 11, 1973 election. The proposition therefore failed.

In late 1973 or early 1974 intervenor Fredregill, a Des Moines developer, expressed interest in redeveloping a three-block area at the east end of the urban renewal area, to include a hotel complex. April 15, 1974 the city amended the initial plan to provide for the city's acquisition of this area and to effect a change in the uses permitted.

The city initiated the procedure required to issue $950,000 in general obligation bonds to provide funds for acquiring the three-block tract. This effort was abandoned, however, after a petition was filed to require an election. See § 408.2, The Code, 1973. Pursuant to alternatives outlined by the city manager, the council decided to finance the acquisition by use of funds then budgeted for other purposes.

An appraiser hired by the city reported the value of the property for acquisition to be $742,950 and for disposition to be $284,000.

June 17, 1974 the city approved offering the three-block area for sale, established a fair value of the parcel for uses in accordance with the amended plan, and set a July 18, 1974 deadline for submission of written proposals for development of the tract.

On July 18, 1974 intervenor Fredregill was the only party submitting a proposal. He appeared with his architect before the urban renewal board to supplement his written proposal, which contemplated construction of a hotel complex by Hometels of America.

Fredregill's proposal was taken under advisement by the board. After requiring several changes in the redeveloper's proposed lease with Hometels, it recommended approval of the proposal to the city council.

December 23, 1974 the council considered the board's report and recommendation and approved intervenor's proposal subject to the disposition of this litigation.

In this appeal plaintiff relies on five propositions for reversal which we consider in the divisions which follow. Our review, of course, is de novo in this equity action. Wilden Clinic, Inc. v. City of Des Moines, 229 N.W.2d 286, 289 (Iowa 1975).

I. *Did the Des Moines City Council act arbitrarily, capriciously and unreasonably in declaring the 67 blocks a slum and blighted area within the meaning of § 403.4 and § 403.17(8), (9), The Code, 1973?*

Plaintiff vigorously argues the area taken as a whole was not slum and blighted within the meaning of the statutes. More-over, he asserts the inclusion of an 18-block section in the main business district was unnecessary for effective redevelopment of the overall area and was incorporated in the plan only for the purpose of securing for increment funding the tax base of buildings then under construction.

We consider these contentions against the backdrop of our prior decisions holding Chapter 403, The Code, to be a constitutional delegation of legislative power to municipalities to govern matters local in scope. *Webster Realty Company v. City of Fort Dodge*, 174 N.W.2d 413, 417–418 (Iowa 1970); see *Richards v. City of Muscatine*, 237 N.W.2d 48, 56 (Iowa 1975). We have said Chapter 403 grants new and unusual powers and permits sweeping and drastic municipal innovations. *Webster Realty Company v. City of Fort Dodge*, supra, 174 N.W.2d at 421; *Wilson v. Iowa City*, 165 N.W.2d 813, 823 (Iowa 1969).

■ Ordinances of a municipality are presumed to be reasonable, valid and constitutional. *Cedar Rapids Human Rights Commission v. Cedar Rapids Community School District*, 222 N.W.2d 391, 399 (Iowa 1974); *Mason City v. Zerble*, 250 Iowa 102, 110, 93 N.W.2d 94, 98–99 (1958). And it is not for the judicial branch of government to pass upon the wisdom of a local law enacted by a municipal council. *Henrichs v. Hildreth*, 207 N.W.2d 805, 806 (Iowa 1973); *Baird v. Webster City*, 256 Iowa 1097, 1104, 130 N.W.2d 432, 436 (1964).

Plaintiff does not assert unconstitutionality on the issue treated in this division. Instead, he argues the city's determination of slum and blight and of the perimeters of the urban renewal area violated criteria specified in §§ 403.17(8) and (9), The Code. He concedes the city's determination stands unless it was arbitrary, capricious or unreasonable. *Berman v. Parker*, 348 U.S. 26, 34–35, 75 S.Ct. 98, 102–103, 99 L.Ed. 27, 38–39 (1954); *Housing and Redevelopment Authority v. Coleman's Service, Inc.*, 281 Minn. 63, 66–67, 160 N.W.2d 266, 270 (1968); *Urban Renewal Agency v. Iacometti*, 79 Nev. 113, 118, 379 P.2d 466, 468 (1963);

*Runnels v. Staunton Redevelopment and Housing Authority*, 207 Va. 407, 411, 149 S.E.2d 882, 885 (1966); 2 McQuillin, Municipal Corporations § 10.33 at 823–828 (rev. 3d ed. 1966).

Plaintiff also concedes the well-settled rule it is the area as a whole which is controlling in making the determination of slum and blight. *Berman v. Parker*, supra; *Crawford v. Redevelopment Authority*, 418 Pa. 549, 555, 211 A.2d 866, 869 (1965); *Bristol Redevelopment & Housing Authority v. Denton*, 198 Va. 171, 178–179, 93 S.E.2d 288, 294 (1956). He recognizes an area can be slum and blighted though it contains sound structures with no deficiencies. *Grubstein v. Urban Renewal Agency*, 115 So.2d 745, 748 (Fla.1959); *Lyons v. City of Camden*, 52 N.J. 89, 97, 243 A.2d 817, 820–821 (1968); *Crawford v. Redevelopment Authority*, supra, 418 Pa. at 555, 211 A.2d at 869.

■ Plaintiff must carry the heavy burden imposed by the above rules in attacking the city's determination the area was blighted, without regard to the finding it was a "slum *and* blighted" area. The city's action was justified even if the tract was only a blighted area. See, e. g., § 403.2(2) (" * . * * slum or blighted areas * * * may require acquisition, clearance, and disposition * * * "); § 403.4 ("No municipality shall exercise the authority herein conferred * * * until after its local governing body shall have adopted a resolution finding that: 1. One or more slum or blighted areas exist in such municipality. 2. * * * "); § 403.5(1) ("A municipality shall not approve an urban renewal project for an urban renewal area unless the governing body has * * * determined such area to be a slum area or a blighted area or a combination thereof * * * "); *Housing & Redevelopment Authority v. Coleman's Service, Inc.*, supra; *Runnels v. Staunton Redevelopment and Housing Authority*, supra.

An overview of plaintiff's brief discloses an unwarranted preoccupation with the condition of buildings within the 67-block area, and particularly those within the controverted 18-block portion. While our stat-utory definition of "slum area", § 403.17(8), The Code, stresses the condition of buildings and improvements, that factor is only one of many criteria applied to determine whether an area is blighted. Section 403.-17(9), The Code, provides:

"9. *'Blighted area'* shall mean an area which by reason of the presence of a substantial number of slum, deteriorated or deteriorating structures, predominance of defective or inadequate street layout, faulty lot layout in relation to size, adequacy, accessibility or usefulness, insanitary or unsafe conditions, deterioration of site or other improvements, diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land, defective or unusual conditions of title, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs or arrests the sound growth of a municipality, retards the provision of housing accommodations or constitutes an economic or social liability and is a menace to the public health, safety, morals, or welfare in its present condition and use: Provided, that if such blighted area consists of open land, the conditions contained in the proviso in section 403.5, subsection 4, shall apply: And provided further, that any disaster area referred to in section 403.5, subsection 7, shall constitute a 'blighted area'."

See also *Rabinoff v. District Court*, 145 Colo. 225, 237, 360 P.2d 114, 121 (1961).

■ Substantial evidence developed at trial disclosed conditions meeting the § 403.-17(9) definition of "blight". The Barton-Aschman study found 67 percent of the buildings "deficient". This included buildings with minor deficiencies, major deficiencies, and those which were substandard. Plaintiff argues buildings with minor *deficiencies* should not be considered because minor *defects*, as defined in the study, are those which can be fixed in course of normal maintenance. Plaintiff overlooks the fact the buildings classified in the study chart as "minor deficient" are defined as

having "more than three minor defects but less than one critical defect". Moreover, the report states "deficient buildings contain defects which are not easily correctable and cannot be accomplished in the ordinary course of maintenance". In our view the city could have reasonably concluded these buildings with defects which could not be cured in the ordinary course of maintenance were "deteriorating" within the blighted-area definition of § 403.17(9), The Code. Sixty-seven percent would be a "substantial" number within the requirement of that section.

Beyond that, plaintiff virtually ignores substantial evidence which discloses other blighting conditions which under § 403.17(9) would justify designation of a tract as a "blighted area". There was testimony pinpointing insufficient public utilities, sewer deficiencies, traffic congestion, and parking inadequacies. The study, as we have already noted, also identified storm sewer deficiencies, incompatible land uses, and diverse land ownership of small parcels which impeded growth.

Several of these conditions prevailed in the western 18-block portion of the region designated as the urban renewal area. The overall plan adopted ties the 67 blocks together for redevelopment, rehabilitation and conservation.

▆ Plaintiff's attack on the council members' motives, alleging the 18-block tract was included in the area to secure a valuable area for tax increment financing, is blunted by the above indicated evidence. Further, it is deflected by applicable law holding the court does not ordinarily examine the motives of those exercising legislative power in a manner which is not manifestly arbitrary, capricious or unreasonable. *Midwest Investment Co. v. City of Chariton*, 248 Iowa 407, 416, 80 N.W.2d 906, 911 (1957) and citations; *City of Chicago v. R. Zwick Co.*, 27 Ill.2d 128, 132, 188 N.E.2d 489, 491 (1963). We add the *caveat* this rule may have no application in a § 403.16 situation (personal interest in property included or planned to be included in an urban renewal project), or where there is

some other real or potential conflict of interest. *Wilson v. Iowa City*, 165 N.W.2d 813 (Iowa 1969).

▆ On this issue we hold plaintiff has not carried his burden of proof. The question of what constitutes a "blighted area" within the meaning of Chapter 403 is a legislative question, political in nature and involving questions of public policy. Annot., Urban Renewal Statutes—"Blighted Area", 45 A.L.R.3d 1096, 1105 (1972); 40 Am.Jur.2d Housing Laws and Urban Redevelopment § 19, at 1075–1076 (1968). It is not for the courts to oversee the choice of a boundary line nor to sit in review on the size of a particular project area. *Berman v. Parker*, supra, 348 U.S. at 35, 75 S.Ct. at 104, 99 L.Ed. at 39. Neither do we formulate or apply precise percentages or mathematical equations to determine what combination of § 403.17(9) criteria results in a determination of blight. *City of Chicago v. R. Zwick Co.*, supra, 27 Ill.2d at 134, 188 N.E.2d at 492. We simply hold that plaintiff, on this record, has failed to prove the city's action in designating the 67-block tract as an urban renewal area was arbitrary, capricious or unreasonable.

II. *Did the city's revised plan contemplate the sale of acquired property to a redeveloper at less than its fair value thereby rendering its approval of the project illegal?*

▆ Section 403.8(1), The Code, provides that property acquired in an urban renewal area "shall be sold, leased, otherwise transferred, or retained at not less than its fair value for uses in accordance with the urban renewal plan."

Plaintiff asserts the city approved sale of the three-block parcel to redeveloper Fredregill (the intervenor) for less than fair value, pointing to a $458,950 difference between the appraised acquisition cost of $742,950 and the appraised fair value for disposition purposes of $284,000.

The appraiser's testimony and other evidence furnished adequate explanation for this difference. The land would be sold in one tract, although the city would be re-

quired to purchase or condemn the area in over 20 separate parcels. Uncontroverted testimony indicated land sells for less per square foot in large tracts than in small tracts.

Under the plan revision the developer would be required to bear the cost of demolishing all structures on this three-block acquisition, cutting off utilities and making specified site improvements such as filling excavations and building sidewalks.

Other burdens were imposed on the parcel, including restrictive parking requirements and time limits for development in accordance with the revised plan.

The evidence developed this type of "writedown" in value was a characteristic of such renewal projects.

Plaintiff's only evidence on the "fair value" of the parcel consisted of testimony of a developer whose major experience was in Illinois. He admitted on cross-examination he was unfamiliar with the use restrictions placed on the parcel under the urban renewal plan. Plaintiff failed to carry his burden of proving the city set an inadequate dispositional value in violation of § 403.8(1), The Code.

■ As a subsumed issue plaintiff asserts a city fire station located in the three-block acquisition was given to the developer in violation of *Gritton v. City of Des Moines*, 247 Iowa 326, 73 N.W.2d 813 (1955). *Gritton* held that a city, without express or implied legislative authority, could not transfer to a private corporation, for a grossly inadequate monetary consideration, valuable property held in the city's governmental capacity. This appeal does not require us to reach the question whether Chapter 403 provides the express legislative authority absent in *Gritton*, or whether that case is wholly inapplicable.

The evidence disclosed the fire station property was not to be separately appraised or included in the acquisition value because the city already owned it. However, the *land* under the station was appraised and its value included in the total dispositional value because the entire area would be sold.

The appraiser testified he appraised the property as if the building would be demolished. He had no opinion whether or not the building would make any contribution to the dispositional value. Apparently it did not, for the redevelopment proposal submitted by Fredregill did not contemplate retention of the fire station building. Plaintiff advanced no evidence as to the value, if any, of the building.

Under these facts, plaintiff has not carried his burden to show there was any gift of valuable property to which the *Gritton* rule, if applicable at all, would attach.

We hold there is no merit in these issues raised by plaintiff. See *Club Jolliet, Inc. v. Manchester*, 110 N.H. 172, 176, 262 A.2d 844, 846 (1970); *Velishka v. City of Nashua*, 99 N.H. 161, 166, 106 A.2d 571, 575–576 (1954).

■ III. *Did Fredregill's redevelopment proposal so fail to comply with § 403.8(2), The Code, 1973, and specifications prescribed by the city council and urban renewal board that the city's act of approving it was illegal?*

Section 403.8(2) provides:

"2. A municipality may dispose of real property in an urban renewal area to private persons only under such reasonable competitive bidding procedures as it shall prescribe, or as hereinafter provided in this subsection. A municipality, by public notice by publication in a newspaper having a general circulation in the community, thirty days prior to the execution of any contract to sell, lease or otherwise transfer real property, and prior to the delivery of any instrument of conveyance with respect thereto under the provisions of this section, may invite proposals from and make available all pertinent information to any persons interested in undertaking to redevelop or rehabilitate an urban renewal area, or any part thereof. Such notice shall identify the area, or portion thereof, and shall state that proposals shall be made by those interested within thirty days after the date of publication of said notice, and

that such further information as is available may be obtained at such office as shall be designated in said notice. The municipality shall consider all such redevelopment or rehabilitation proposals, and the financial and legal ability of the persons making such proposals to carry them out, and the municipality may negotiate with any persons for proposals concerning the purchase, lease or other transfer of any real property acquired by the municipality in the urban renewal area. The municipality may accept such proposal as it deems to be in the public interest and in furtherance of the purposes of this chapter: Provided, that a notification of intention to accept such proposal shall be filed with the governing body not less than thirty days prior to any such acceptance. Thereafter, the municipality may execute such contract in accordance with the provisions of subsection 1 of this section and may deliver deeds, leases and other instruments and may take all steps necessary to effectuate such contract."

The city council's resolution approving the offering of the three-block parcel for sale provided for a notice to be published June 19, 1974, fixing a deadline of July 18, 1974 for submitting proposals. The resolution provided the proposals should be in substantial conformance with forms attached to the resolution and with the "explanation and instructions" also attached these instructions in part provided,

"All proposals must be submitted in four signed copies, and must be accompanied by the following documents * * *

(a) * * *

(b) * * *

(c) Such graphic material (such as sketches, schematic site development or plot plans, building elevations, typical floor plans, etc.) and a narrative information in explanation thereof as is necessary to supplement the proposal and to show the extent to which the proposal meets the objectives and requirements of the Urban Renewal Plan, as amended, and to permit the city to evaluate the architec-

tural, landscaping and planning skills and ingenuity demonstrated in the proposal. All maps, plans, sketches, narrative statements, etc., submitted to meet the requirements of this item (c) shall be submitted in four copies."

The instructions further provided:

"Proposals may be submitted only for the entirety of Disposition Parcel 1, not for subparcels or other portions thereof. The right is reserved by the City of Des Moines to reject any or all of the proposals and to waive informalities in any proposal."

Fredregill submitted his proposal in writing and by oral submission with his architect on July 18, 1974. No other developer evidenced interest or submitted a bid. Fredregill's proposal is in evidence. All the forms were adequately completed in "substantial conformity" as required by the city resolution. Plaintiff does not contest Fredregill's conformance with all supplemental instructions except it is asserted he did not submit four copies of graphic material supplementing the proposal.

Plaintiff argues Fredregill failed to submit elevation charts and typical floor plans before the July 18 deadline thereby violating "the requirement that such charts and plan *must* accompany the *proposal*". The requirement is not so clear-cut: the instructions only require such graphic material "as is necessary". There is no evidence in this record these charts and plans were "necessary" to the city's evaluation of the redeveloper's proposal. Plaintiff failed to meet his burden to show a procedural violation in this respect.

This situation is distinguishable from that in *Inn Operations, Inc. v. River Hills Motor Inn Co.*, 261 Iowa 72, 152 N.W.2d 808 (1967), relied on by plaintiff. In that case, after competitive bidding, the city modified the urban renewal plan to conform to a bid and proposal already accepted. We held this to be a violation of the statutory requirement of reasonable competitive bidding procedures. In the case *sub judice* the urban renewal plan modification was adopted April 15, 1974, weeks in advance of publica-

tion of notice for bids and proposals. The bid form required an amended plan to be submitted to each redeveloper interested in bidding.

Plaintiff also asserts violation of § 403.8(2) requiring the city to "consider * * * the financial and legal ability of the persons making such proposals to carry them out". He argues certain properties itemized as assets on Fredregill's financial statement (one of the requisite forms attached to the proposal) were overvalued because they were in excess of the city assessor's tax assessment valuations. Plaintiff asserts intervenor's net worth was thus reduced from $1,051,322 to $471,212 as the city could have easily determined by examining the city assessor's records. This failure, he asserts, violated the duty imposed by § 403.8(2).

The evidence discloses reasons for the difference. The properties in each instance were valued by different appraisers for different purposes.

This court will presume the actions of public officials are regular unless clear evidence to the contrary appears. *Gunson v. Williams*, 242 Iowa 916, 919, 48 N.W.2d 809, 810 (1951). No such evidence appears here. We will not presume the council failed to carry out its duty under § 403.8(2) to consider the redeveloper's financial condition. See *Annbar Associates v. West Side Redevelopment Corp.*, 397 S.W.2d 635, 655 (Mo. 1965).

Plaintiff argues the requirement for submission of bids by July 18, 1974, was unrealistic and gave Fredregill an unfair advantage because he began to work on plans months before the notice for bids and proposals was published.

Evidence relating to the reasonableness of the time sequence was conflicting. Lewis Pond, director of urban development for Des Moines, testified the period would be sufficient for redevelopers to fashion the generalized type plan called for by the bid specifications. The bidding documents which are in evidence indicate more detailed information was to follow selection. Plaintiff's witness, a developer whose main experience was in Illinois and who was unfamiliar with the proposal requirements, testified it would take longer. Obviously any other developer could have taken the lead in initiating a proposed development just as Fredregill did.

The first sentence of § 403.8(2), supra, gives the municipality an option to prescribe its own "reasonable competitive bidding procedures" or to follow the procedure thereafter specified. Through trial and appellate briefing plaintiff apparently assumed the city had employed the statutory 30-day notice to submit bids. His brief states, "Thus, although the bidding procedures provided for the minimum number of 30 days notice, such time limit was unrealistic and unfair under the circumstances."

Only upon oral argument did plaintiff for the first time assert the offering of the three-block area was invalid because notice was published only 29 days prior to close of bids and violated the statute. Of course, we do not consider issues raised for the first time in oral argument. *Farrington v. Freeman*, 251 Iowa 18, 26, 99 N.W.2d 388, 392–393 (1959); see *State v. Schultz*, 245 N.W.2d 316, 318–319 (Iowa 1976); *Boss Hotels Company v. City of Des Moines*, 258 Iowa 1372, 1374–1375, 141 N.W.2d 541, 543 (1966).

In any event, the city's resolution approving the offering of the property indicates it elected to prescribe its own "reasonable competitive bidding procedures" rather than follow the alternative statutory steps.

The fixing of the bid cut-off date by either the legislature or the municipality is legislative in nature. The judicial branch of government does not pass on the wisdom of legislative acts. *Green v. City of Mt. Pleasant*, 256 Iowa 1184, 1196, 131 N.W.2d 5, 13 (1964); see also *State v. Hall*, 227 N.W.2d 192, 193 (Iowa 1975). The city's legislative determination to use a 29 day period cannot be disturbed unless unreasonable, arbitrary, capricious, fraudulent or against the overwhelming evidence. *Runnels*, supra, 207 Va. at 410, 149 S.E.2d at 884. Plaintiff's limited proof was insufficient to meet this test.

IV. *Did the city council act illegally in diverting capital improvement money to urban renewal fund without amending capital improvements budget or applying for approval of transfer with the state appeal board?*

After the city council concluded not to fund the three-block acquisition with $950,000 in general obligation bonds, it requested the city manager to suggest alternative funding. The manager's suggestion, which the city adopted, was to transfer $740,000 from the capital improvements project budget (comprising general revenue sharing funds) by eliminating from that budget a storm sewer project and various park improvement projects which could be later funded with general obligation bonds. The remaining $210,000 would be obtained through temporary utilization of an appropriation in the urban development budget for the "simulated FHA Section 235 Housing Project". This sum could be returned for its intended use in the revised 1974–1975 operating budget. In the event voters approved a referendum for tax increment bonds to finance the three-block acquisition, these sums could also be replaced with bond proceeds.

Plaintiff alleges the council on February 4, 1974, adopted a "1974 Capital Improvement Budget" which was not thereafter amended to show the transfer of the $740,000 sum. Further, no application was made to the state appeal board as required by § 24.22, The Code, 1973 ("Upon the approval of the state board, it shall be lawful to make temporary or permanent transfers of money from one fund of the municipality to another fund thereof * * * "). See also § 404.5(4), The Code, 1973.

In *Baird v. Webster City*, 256 Iowa 1097, 1111–1114, 130 N.W.2d 432, 440–442 (1964) this court discussed some of the aspects of transfer between the functional funds created by §§ 404.2 to 404.12, The Code, 1973 (repealed, Acts 64 G.A. Ch. 1088 (1972) effective July 1, 1975).

We are not persuaded on this record there was any illegality as asserted by plaintiff.

The approximately $50,000 which prior to trial had been expended on the three-block acquisition was already in the general fund. It was not part of the $740,000 transfer which is the subject of plaintiff's complaint.

City manager Wilkey testified this $740,000 was in the Trust and Agency fund. See § 404.16, The Code, 1973. His instructions were to transfer this amount from that fund to the general fund when the budget was amended. This amendment was made in December 1974. Plaintiff's witness Francis Larew, executive secretary of the state appeal board, confirmed from exhibits in evidence this budget amendment was received in his office December 20, 1974 and approved by the state appeal board.

Under this state of the record, we find plaintiff's contention to be without merit.

V. *Did the Capitol Center Development Urban Renewal Plan violate the United States Constitution, Amendments 5 and 14, and the Iowa Constitution, Article I, §§ 1, 6, 18 and 25?*

Plaintiff argues the plan adopted violates the United States and Iowa Constitutions because it abuses the power of eminent domain and grants special privileges to a private redeveloper. These issues have been resolved adversely to plaintiff's contentions. *Berman v. Parker,* supra, 348 U.S. at 33, 75 S.Ct. at 103, 99 L.Ed. at 38; *R & R Welding Supply Company v. City of Des Moines,* 256 Iowa 973, 977, 129 N.W.2d 666, 669 (1964); *Rabinoff v. District Court,* 145 Colo. 225, 234–235, 360 P.2d 114, 120 (1961); Annot., Urban Redevelopment Laws, 44 A.L.R.2d 1414 (1955); 40 Am. Jur.2d Housing Laws and Urban Redevelopment § 22, at 1077, 1078 (1968).

Finally, plaintiff asks us to declare any future city plan to replace funds used in acquisition of the three-block area with tax increments extending over the 67-block area to be unconstitutional because it would deprive citizens in other areas the tax base created by private new construction, inflation, and other natural factors.

For support of this prong of his attack, plaintiff relies on the following language in *Richards v. City of Muscatine*, 237 N.W.2d 48, 60–61 (Iowa 1975):

"In division XV of their brief, plaintiffs argue that § 403.19 invalidly purports to authorize Muscatine to allocate the taxes on real estate not included within an actual urban renewal area. For example, plaintiffs say, a city could under § 403.19 establish a large urban renewal area, freeze the property tax valuation of the whole area, and then redevelop only a small portion of it. Plaintiffs assert § 403.19 therefore violates the prohibition against special privileges in § 6 of article I.

We do not think § 403.19 would allow a city to do what plaintiffs fear it would. First, § 403.19 only allows the division of taxes 'levied on taxable property *in an urban renewal project* * * *.' (Italics added.) An 'urban renewal project' is defined by § 403.17(10) as including 'undertakings and activities of a municipality in an urban renewal area' * * *. The legislation contains no suggestion that the General Assembly intended 'urban renewal project' to encompass a territory which a city merely designates as an urban renewal area but redevelops only in small part.

Second, the apparent purpose of § 403.-19—enabling payment of urban renewal bonds out of the tax increment brought about by the project itself—leads to the same conclusion. That section does not appear to contemplate applying a valuation freeze to areas not actually being redeveloped.

We thus find that § 403.19 can be applied to freeze the tax valuation only in areas being physically redeveloped by an urban renewal project."

Responding, the city argues plaintiff has misconstrued *Richards*, and in any event, the issue raised is moot because the city has no proposition before it to finance any part of the total redevelopment by tax increment financing.

We do not think *Richards*, properly interpreted, would prohibit the tax increment financing plaintiff fears in the case before us. Apparently the situation hypothecated to support a declaratory judgment by the *Richards* plaintiff was grounded on the same concept advanced by this plaintiff: an improper inclusion of a tract within an urban renewal area not for redevelopment but for tax base purposes. The primary assault in both cases is directed at the actual or hypothecated motives and good faith of the city council. In division I, supra, we have held against this plaintiff on these contentions. Had plaintiff prevailed on the division I issue, the rule in *Richards* would clearly apply.

An overview of the city's action approved in division I is helpful. The council's resolution adopting the Capitol Center Development Urban Renewal Plan, after published notice and hearing, determined the 67-block tract to be a blighted area, "appropriate and eligible for an Urban Renewal Project", and specifically provided:

"3. That the Urban Renewal *Plan* for the Urban Renewal *Area* described on Exhibit 'A' [the 67-block tract] attached hereto and made a part hereof is hereby in all respects approved; the Capitol-Center Development Area Urban Renewal *Project* for such area based upon such plan is hereby in all respects approved * * *." (Emphasis supplied.)

The April 15, 1974 amendment to the plan simply expanded the property acquisition map (designating tracts to be acquired by purchase or condemnation) and amended the use restriction provisions. Thus the council legislatively adopted an urban renewal plan incorporating a 67-block urban renewal area and outlining an urban renewal project covering the same territory.

This action carries an impressive certificate of legality. In *Henrichs v. Hildreth*, 207 N.W.2d 805, 806 (Iowa 1973) we approved the following from *Cole v. City of Osceola*, 179 N.W.2d 524, 528 (Iowa 1970):

"It is well settled that when the constitutionality of an ordinance is challenged

all reasonable intendments must be indulged in favor of its validity. (citations) The strong presumption in favor of a legislative act applies, as well, to zoning ordinances (citation). One who attacks such legislation on constitutional grounds has the burden of pleading its invalidity and unreasonableness and assumes the burden to negate every reasonable basis upon which the ordinance may be sustained. (citation)".

The rationale and rule of these opinions apply here.

The project in the 67-block area, as we have already indicated, calls for acquisition of a number of properties, basic planning and designing proposals to encourage physical rehabilitation of buildings, placement of existing and proposed utility distribution lines underground wherever feasible, improvements to the storm sewer system and a complete revamping of vehicular and pedestrian traffic flow and re-zoning. All of this area would be affected by such physical redevelopment.

There is no adequate showing in this record any portion of the 67-block area was, in the language of *Richards*, "merely" designated for inclusion in the area for tax base purposes. Comprehensive planning demands such areas be considered in their entirety and not in their unseverable parts. *Crawford v. Redevelopment Authority*, supra, 418 Pa. at 555, 211 A.2d at 869.

Again, plaintiff in asserting this constitutional violation fails to carry the heavy burden of proof imposed by the rule in *Henrichs* and *Cole*, supra.

We have examined all other arguments advanced in plaintiff's brief which are not referred to in this opinion and find them to be without merit. The decree of the district court is affirmed.

AFFIRMED.